COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-251-CV

 

 

IN THE INTEREST OF B.P., JR., A CHILD                                                 

 

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction








Appellant Maria P. appeals an
order appointing the Department of Family Protective Services (DFPS) as
permanent managing conservator of B.P. 
In her first two points, Maria argues that the evidence is legally and
factually insufficient to support the trial court=s finding that appointing Maria as managing conservator would
significantly impair B.P.=s physical
and emotional development.  In her third
point, Maria asserts that the trial court abused its discretion by failing to
appoint her as possessory conservator of B.P. 
We will affirm in part and reverse and remand in part.

II. Factual and Procedural Background

Maria is the mother of
ten-year-old B.P., who has been diagnosed with bipolar disorder, psychotic
disorder, oppositional defiant disorder, and attention deficit hyperactivity
disorder.  Prior to this case, Child
Protective Services (CPS) had received six referrals regarding Maria and her
care for B.P.  These referrals, some for
medical neglect, were eventually either Aruled out@ or labeled Aunable to determine.@








The current case with B.P.
began in December 2005 when either Maria or her cousin, Nina F., called CPS to
come and remove B.P. from Nina=s house.  Both Maria and B.P.
were living with Nina at the time of removal.[2]  The incident that led to the removal began as
an argument over a toy between B.P. and Nina=s boyfriend.  The incident
escalated, and B.P. climbed in a tree and threwCor at least threatened to throwCrocks at the boyfriend=s car.  Although Maria claims
that Nina actually called CPS and that she never talked to CPS on that
occasion, Cacana Young, a CPS investigator, testified that after the incident,
Maria told her that she thought it would be in B.P.=s best interest if he received treatment and was placed in a foster
home.

CPS took custody of B.P. in
December 2005, and since that time, B.P. has been placed in one shelter, five
foster homes, and has been hospitalized four times.  B.P. is now being treated and monitored at a
residential treatment center in Victoria, Texas.  On December 28, 2005, DFPS filed a suit affecting
the parent child relationship, seeking termination of Maria=s parental rights and permanent managing conservatorship of B.P.  After a hearing on June 14 and 22, 2007, the
trial court found that it would be in B.P.=s best interest to appoint DFPS as managing conservator.  The trial court made clear to both parties
that the ultimate goal in the case is to have B.P. return to his home with
Maria.  The trial court also dismissed
DFPS=s petition to terminate Maria=s parental rights without prejudice.

III. Managing Conservatorship

In her first two points,
Maria argues that the evidence is legally and factually insufficient to support
the trial court=s finding
that appointing Maria as managing conservator would significantly impair B.P.=s physical and emotional development.

 

 








A.     Standards of Review

We give wide latitude to a
trial court=s decision
on custody, control, possession, and visitation matters.  Earvin v. Dep=t of Family & Protective Servs., 229
S.W.3d 345, 350 (Tex. App.CHouston [1st Dist.] 2007, no pet.) (citing Gillespie v. Gillespie,
644 S.W.2d 449, 451 (Tex. 1982)).  We
will not reverse a conservatorship finding unless the record demonstrates that
the trial court abused its discretion.  See In re J.A.J., 243 S.W.3d 611, 616
(Tex. 2007); Whitworth v. Whitworth, 222 S.W.3d 616, 622B23 (Tex. App.CHouston [1st
Dist.] 2007, no pet.) (op. on reh=g).  Under an abuse of
discretion standard, challenges to the legal and factual sufficiency of the
evidence are not independent grounds of error; rather, they are simply factors
in assessing whether the trial court abused its discretion.  Gardner v. Gardner, 229 S.W.3d 747,
751 (Tex. App.CSan Antonio
2007, no pet.).  








In determining whether there
has been an abuse of discretion because the evidence is legally or factually
insufficient to support the trial court=s decision, we engage in a two‑pronged inquiry: (1) Did the
trial court have enough information upon which to exercise its discretion; and
(2) did the trial court err in applying its discretion?  The traditional sufficiency review comes into
play with regard to the first question.  In
re W.M., 172 S.W.3d 718, 725 (Tex. App.CFort Worth 2005, no pet.); In re T.D.C., 91 S.W.3d 865, 872
(Tex. App.CFort Worth
2002, pet. denied).  With regard to the
second question, we determine, based on the elicited evidence, whether the
trial court made a reasonable decision.  W.M.,
172 S.W.3d at 725; T.D.C., 91 S.W.3d at 872. 

B.     Section 153.131 B Significant Impairment

There is a strong presumption
that the best interest of a child is served if a natural parent is appointed as
a managing conservator.  Whitworth, 222 S.W.3d at 623; see
also Tex. Fam. Code Ann. ' 153.131(a) (Vernon 2002). Section 153.131 provides that a parent
shall be appointed sole managing conservator unless the court finds that
appointment of the parent or parents would not be in the best interest of the
child because the appointment would significantly impair the child=s physical health or emotional development.  Tex.
Fam. Code Ann. ' 153.131(a).








For the court to award
managing conservatorship to a non‑parent under section 153.131, the non‑parent
must prove a significant impairment by a preponderance of credible
evidence.  Whitworth, 222 S.W.3d
at 623; see also Tex. Fam. Code
' 105.005 (Vernon 2002) (AExcept as otherwise provided by this title, the court=s findings shall be based on a preponderance of the evidence.@); J.A.J., 243 S.W.3d at 616. 
There must be evidence to support the logical inference that some
specific, identifiable behavior or conduct of the parent will probably cause
that harm.  Whitworth, 222 S.W.3d
at 623.  Indeed, the non‑parent
must offer evidence of specific acts or omissions of the parent that
demonstrate an award of custody to the parent would result in physical or
emotional harm to the child. Lewelling v. Lewelling, 796 S.W.2d 164, 167
(Tex. 1990); Whitworth, 222 S.W.3d at 623.

An adult=s future conduct may be somewhat determined by recent past conduct;
however, evidence of past misconduct, in and of itself, may not be sufficient
to show present unfitness.  Whitworth,
222 S.W.3d at 623.  Specific acts or
omissions of a parent implicating a significant impairment to a child=s emotional development may be inferred from direct evidence.  Id. 
However, this link between the parent=s conduct and harm to the child may not be based on evidence which
merely raises a surmise or speculation of possible harm.  Id.

1.     Maria

DFPS=s primary concern is that Maria is unable, at this time, to provide a
stable environment for B.P.  The record
supports this concern as two CPS caseworkers and one of Maria=s former counselors testified about Maria=s instability and its effect on B.P.








DFPS cites multiple living
arrangements over the course of the case as a contributing factor to her
instability.  At the time of the hearing,
Maria lived in an apartment in Garland, Texas, where she had been for two
months.  However, according to Tonyia
Brown, a CPS caseworker, Maria had moved at least six times since the case
began, which was at that time, approximately eighteen months.

DFPS also points to Maria=s employment history as evidence of instability.  Young testified that Maria was not employed
at the time of B.P.=s removal.
Brown stated that Maria had not had stable employment throughout the case.  Maria testified that she was working at the
time of B.P.=s removal
and that she had always worked since B.P. was born.  However, when asked where she had been
employed over the two years prior to the hearing, Maria responded as follows:

Well,
I haven=t
been employed for the last year.  I was
kind of recovering from my son being taken, so I didn=t
work prior to this job.  I worked at the
Waffle House for a little while because they told me I had to get a job when
they first took my son, but then after that I just kind of didn=t
want to work and then before that, I worked at Owens
Auto.  (Emphasis added).

 

Maria stated that Owens Auto Alet [her] go@ partly
because CPS began calling. At the time of the hearing, she was employed at
Quality Moving Systems and performed some type of insurance work.  Brown later testified that she did not have
any proof of income from Maria=s new job although she had contacted Maria at the work phone number
that she had provided.








DFPS argues that Maria=s instability is evidenced by the considerable testimony regarding
visitations with B.P.  DFPS set up weekly
visits between Maria and B.P. that were ultimately discontinued after Maria
missed several visits in a row.  Brown
stated that Maria had missed visits for close to two months straight and failed
to keep in contact with Brown during that time period.  Maria testified that she had missed only four
visits with B.P. around the time that her mother passed away.  She disputed that she had ever missed more
than four visits, but when she was confronted with her testimony from a
previous hearing regarding missed visits in April, May, and June 2006, she
said, AWell, I don=t really
recall a lot of the stuff that happened back then.  I was grieving my mother.@  She also claimed that CPS did
not make visits available to her after B.P. had been allegedly Amistreated@ by a foster
parent.  Brown testified that B.P. was
never kept from seeing Maria because of an injury or abuse allegations.  CPS cancelled three visits because either
B.P. was sick or there were transportation difficulties, but it made up every
visit it was responsible for cancelling.

Brown testified that Maria
had also not consistently participated in phone therapy with B.P.  Maria stated that she had taken part in one
phone-therapy session and that she had tried to participate in more but that
B.P.=s therapist at the residential treatment center never returned her
phone calls.








DFPS asserts that Maria has
shown instability by not completing her service plan.  Specifically, DFPS set up for Maria
counseling or therapy sessions with two separate agencies, but both times, the
counseling sessions were discontinued based on Maria=s noncompliance with scheduled visits. 
Daniels-Rice, Maria=s second counselor, worked with Maria on her depression, self-esteem,
and helping her become more stabilized to be able to care for her
children.  Daniels-Rice diagnosed Maria
with depression but stated that Maria never accepted that diagnosis.  In response to this testimony, Maria said
that Daniels-Rice never diagnosed her with depression.

In total, Maria made sixteen
counseling sessions with Daniels-Rice over six months, but the sessions were
eventually cancelled after Maria missed seven visits.  Daniels-Rice generally cancels counseling
cases after two missed visits, but she kept Maria longer because she felt that
Maria needed to be stabilized on medication to help treat her depression, which
Daniels-Rice thought contributed to her missed appointments.  Daniels-Rice stated that Maria worked hard when
she showed up for the counseling visits. 
She also stated that Maria needs to continue counseling although she is
unwilling to see Maria again because of her agency=s policy on missed visits.

DFPS set up a third counseling
session for Maria, but Brown stated that to her knowledge, Maria had not set up
an appointment as of the time of trial. 
Maria stated that if B.P. were returned to her, she would make sure to
attend all required counseling sessions.








Maria still needs to complete
her psychiatric evaluation, which was recommended after she completed her
psychological evaluation.  Maria claims
that she has tried to set up the psychiatric evaluation but that it has been
difficult because of her busy schedule. 
She stated, however, that she has been Acertified@ through
other agencies such as North Star and Mental Health Mental Retardation.  She also needs to complete her education at
the Bipolar Foundation.  Additionally,
DFPS recommends that Maria complete family counseling with B.P. and B.P.=s fourteen-year-old sister, who, after eight years away, is now living
with Maria.

Maria completed a parenting
class through the Child and Family Guidance Center as part of her service plan
and is now participating in a program called Step Up Parenting, which is
designed specifically for parents of children who have mental disabilities but
is not part of her service plan.  She
claims that while she is not currently seeing a therapist that Step Up
Parenting is a Atherapy
setting.@

2.     B.P.








The supreme court has noted
that Athe act of a parent in placing a child in an unstable environment is
the very type of conduct that the Legislature contemplated would significantly
impair the physical or emotional development of a child.@[3]  See Lewelling,
796 S.W.2d at 167 n.4.  Here, structure
and stability, or lack of such qualities, are paramount concerns in our
decision.  As set forth below, the
severity of B.P.=s
psychological condition requires it. 








Although Maria denies
knowledge of some incidents and outright disputes others, there was testimony
presented at the hearing that demonstrates a long history of psychological
disturbances that at times ended in injuries or threatened injuries to B.P. and
others.  Before the case began, B.P.
experienced auditory and visual hallucinations, and at one point, B.P.
attempted to kill himself.  At age seven,
B.P. was twice admitted to psychiatric hospitals.  Since the inception of the case, B.P. has
continued to have numerous emotional and physical outbursts, leading to B.P.=s placement at a residential treatment facility. 

At one foster home, B.P.
became upset when certain children at the home were put in Atimeout.@  He then picked up a trophy and struck the
foster parent in the head.  B.P. ran away
from homeCa common
theme throughout the caseCand when he
returned, the foster parents tried to restrain B.P. and calm him down.  B.P. responded by grabbing a knife and
threatening the foster parents.  The
foster parents called the police, and when the police arrived, B.P. still had
the knife drawn.  B.P. ended up throwing
rocks at everyone before the police were able to restrain him in handcuffs and
take him to Timberlawn Hospital for psychiatric evaluation.








Another time, B.P. ran away
from school, and when he returned, his foster parent picked him up and
attempted to take him to the hospital. 
B.P. got into the car but later jumped out into traffic.  B.P. was not hurt during this incident
although he was again taken to Timberlawn Hospital.  On a different occasion, B.P. became upset
when he could not get in contact with Maria and attempted to run away.  Unable to open the door, B.P. broke through
the glass to escape.  The glass cut B.P,
and he later received stitches for the injury. 
Also, since he has been at the residential treatment center, he has
displayed self-harming behaviors, such as biting himself and hitting his head
into other objects.  Brown stated that he
still exhibits some of the self-harming behaviors at the center but not as much
as he once did.  Lastly, as mentioned
above, B.P. argued with Nina=s boyfriend over a toy and threw rocks at his car.  Maria disputes that B.P. ever threw rocks and
asserts that she eventually calmed him down before he caused any damage.

Maria claims that the reason
B.P. has had so many problems in CPS=s custody is because he feels like he has Abeen ripped out of [her] home.@  Maria believes that B.P. Afeels abandoned@ and if he
were returned to her that his misbehavior would not continue except for
problems in readjusting to living at home.

C.     Conclusion








We recognize that Maria has
taken some steps to stabilize her life, but there remains a list of incomplete
requirements that we cannot ignore.  Most
notably, Maria has shown an inability to consistently meet her own mental
health needs by failing to schedule a psychiatric evaluation and twice failing
to complete the recommended counseling sessions because of noncompliance with
scheduled visits.  And as of the time of
trial, she still had not taken the affirmative step to continue counseling even
though a third counseling session had been set up for her.  Before CPS placed B.P. in the residential
treatment center, Maria also missed several visitations with B.P., resulting in
CPS cancelling the weekly visitations. 
Further, although unemployment will not support a significant impairment
finding[4]Cand in fact Maria was employed at the time of the hearingCMaria has shown an indifference in the past towards securing steady
employment in light of CPS=s request that she work after losing possession of B.P.[5]  Maria has not completed the bipolar education
classes recommended to her after her psychological evaluation; however, she has
completed a parenting class and is enrolled in Step Up Parenting.








Given Maria=s inconsistent behavior, her inability to do what was asked of her to
regain custody of B.P., and B.P.=s extreme need for structure and stability, it was within the trial
court=s discretion to conclude that appointing Maria as managing conservator
of B.P. would significantly impair B.P.=s physical and emotional development. 
Thus, we hold under the appropriate standards of review that the trial
court did not abuse its discretion by appointing DFPS as managing
conservator.  See Earvin,
229 S.W.3d at 351 (holding that the trial court did not abuse its discretion by
determining that the appellant was not willing to provide an environment
conducive to his daughter=s physical
health and emotional development when the appellant visited the child only once
during DFPS=s temporary
conservatorship and failed to complete his court-ordered service plan, which
included parenting classes, drug tests, and counseling).  We overrule Maria=s first two points.

IV. Possessory Conservatorship

In her third point, Maria
argues that the trial court abused its discretion by not appointing her as
possessory conservator.  Maria=s attorney requested during closing argument that the trial court
appoint Maria as managing conservator, but, in the alternative, he asked that
if the trial court determined that it was in B.P.=s best interest for him to stay at the residential treatment center,
that the trial court appoint Maria as possessory conservator.  The trial court=s order did not mention possessory conservatorship but did state that
all relief requested but not expressly granted is denied.  Additionally, Maria stated in her motion for
new trial on the order naming DFPS as managing conservatorCwhich the trial court deniedCthat the trial court abused its discretion by not appointing her as
possessory conservator.








The State agrees with Maria
that the trial court abused its discretion. 
The State asserts that Athe trial court seems to have granted [Maria] the rights she requested
as a possessory conservator without any of the
obligations. . . . Maria appears to be correct in her assertion
that the trial court abused its discretion when it failed to formally name her
as possessory conservator.@  While we disagree on the exact
reasoning that the trial court erred, we ultimately agree with both parties
that the trial court should have appointed Maria possessory conservator.  

If a managing conservator is
appointed, the court may appoint one or more possessory conservators.  Tex.
Fam. Code Ann. ' 153.006(a)
(Vernon 2002).  The court shall
appoint as a possessory conservator a parent who is not appointed as a sole or
joint managing conservator unless it finds that the appointment is not
in the best interest of the child and that parental possession or access would
endanger the physical or emotional welfare of the child.  Id. ' 153.191.  (Emphasis
added).

The trial court made no
express findings regarding the appointment of Maria as possessory
conservator.  The trial court, however,
ordered that Maria shall have reasonable visitation and access to B.P. as
agreed upon and arranged by DFPS, indicating that the court did not find that
parental access would endanger the physical or emotional welfare of the child.








Though courts sometimes use
the words possession and access interchangeably, they are used differently in
the Texas Family Code.  In re Walters,
39 S.W.3d 280, 284 (Tex. App.CTexarkana 2001, no pet.).  A
person with a right of access to a child may approach him, communicate with him
and visit with him, but may not take possession or control of the child away from
the managing conservator.  Id. at
284B85.  A person with a right to
possession of a child may exercise possession and control of the child, to the
exclusion of all other persons, including the managing conservator, during
periods of possession. Id. at 285.








Maria and DFPS read section
153.191Cand rely on Hopkins v. Hopkins as reading it in the same mannerCto mean that if the trial court grants access to the child, then the
trial court is compelled to appoint the parent, who was not named managing
conservator, as possessory conservator.  See
853 S.W.2d 134, 138 (Tex. App.CCorpus Christi 1993, no writ). 
We note that the Hopkins court based its decision on the previous
version of the statute that differs from that at issue in this case.[6]  And, in any event, we read the current
statute as providing that a court could find that access would not endanger the
child but that possession might endanger the child.  Thus, if the court found that appointment of
the parent as possessory conservator would not be in the best interest of the
child and that possession would endanger the child, the court would not be
compelled to appoint the parent as possessory conservator, even if it found, as
in this case, that access would not endanger the child. 

The court is compelled to
appoint the parent as possessory conservator unless it finds that (1) the
appointment of the parent as possessory conservator is not in the best interest
of the child, and (2a) parental possession would endanger the child or (2b)
access would endanger the child.  See
Tex. Fam. Code Ann. ' 153.191.  In sum, a
finding either expressly or implicitly that access would not endanger the child=s physical or emotional welfare does not entirely preclude the court=s discretion in appointing a possessory conservator because the court
could find that possession would endanger the child=s physical or emotional welfare.  









Because the court in this
case found that B.P. needs to stay at the residential treatment facility and
that it was not in his best interest to leave as of the time of trial, we can
infer a finding that unrestricted possession would endanger B.P.=s welfare right now.  We are
mindful, however, that possession is not a sum total proposition.  When a trial court appoints a parent
possessory conservator, it can conclude that unrestricted possession would
endanger the physical or emotional welfare of the child, but that restricted
possession or access would not.  Walters,
39 S.W.3d at 286.  A court can fashion a
possession order that remedies the danger to the child=s welfare by placing restrictions and conditions on possession or
access.  Id.  Indeed, if the trial court appoints a
possessory conservator, it may grant, deny, restrict, or limit the possessory
conservator=s possession
of or access to the child.  See Hopkins,
853 S.W.2d at 137.  It may also grant,
deny, restrict, or limit any rights, privileges, duties, and responsibilities
with respect to the child as are necessary to protect the child=s best interest.  Id.  However, because appointment of a parent as
possessory conservator implies a finding that access by that parent will not
endanger the physical or emotional welfare of the child, complete denial of
access should be rareCi.e., when
it is not in the best interest of the child. 
Walters, 39 S.W.3d at 286B87; see also Tex. Fam.
Code Ann. ' 153.193
(Vernon 2002) (AThe terms of
an order that denies possession of a child to a parent or imposes restrictions
or limitations on a parent=s right to possession of or access to a child may not exceed those
that are required to protect the best interest of the child.@).  








In Walters, the trial
court appointed the father as managing conservator and the mother as possessory
conservator.  Id. at 282.  The trial court restricted the mother=s access and possession because the mother had exhibited behavior in
the past mainly relating to her alcoholism that supported the finding that
unrestricted possession of the child would endanger the child=s welfare.  Id. at 283
(citing evidence that the mother overdosed on drugs in a suicide attempt, drank
to the point of passing out while the child was in her care, passed out and
urinated in a chair, and had violent rages in front of the child).   The court of appeals held that the potential
danger to the child if the parent were granted unrestricted possession could be
remedied by restricted possession or access. 
Id. at 287.








The trial court in that case
stated that the mother shall have possession of the child at all times Amutually agreed between the parties.@  Id. at 283.  It then stated in its findings of fact and
conclusions of law that the mother must exhibit a three-year period of sobriety
before implementation of the standard possession order would be in the child=s best interest.  Id.; see
also Tex. Fam. Code Ann. ' 153.311 (Vernon 2002). 
The mother complained that the trial court erred by effectively denying
her possession of and access to the child by ordering that she have possession
at times Amutually
agreed between the parties.@  Walters, 39 S.W.3d at
285.  The court of appeals ultimately
held that the problem was not that the trial court restricted possession and
accessCalthough it stated that the trial court should not completely deny
accessCbut rather that the order was not sufficiently specific as to the
times and conditions for the mother=s possession of or access to the child.  Id. at 288.

Like in Walters, the
evidence in this case regarding B.P.=s extreme emotional condition and Maria=s inconsistent behavior as of the time of trial supports an implied
finding that unrestricted possession of B.P. might endanger B.P.=s physical and emotional welfare. 
However, the court made clear that the end goal in this case is to have
B.P. return to Maria.  Additionally,
Young testified that DFPS=s plan is to
gradually integrate Maria and B.P. back together to promote family
reunification.

Thus, at some point when B.P.
becomes more stable and when Maria shows an ability to take care of herself by
completing services and establishing a stable lifestyleCi.e., conditions on possessionCMaria could slowly, and with restrictions, begin to take possession of
B.P.  Thus, we cannot say that the trial
court found that possession, albeit restricted possession, would endanger
B.P.  Accordingly, we hold that the trial
court abused its discretion by not appointing Maria as possessory conservator,[7]
and we sustain Maria=s third
point.

 








V. Conclusion

Because we have overruled
Maria=s first two points and sustained her third, we affirm the trial court=s judgment appointing DFPS as managing conservator and reverse the
judgment regarding possessory conservatorship. 
We remand the case to the trial court for further proceedings consistent
with this opinion.

 

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
B:  DAUPHINOT, HOLMAN, and WALKER, JJ.

 

DELIVERED:
July 3, 2008     

 

 

 

 

 

 

 











[1]See Tex.
R. App. P. 47.4.





[2]Maria had agreed with CPS on a
safety plan that placed B.P. with Nina. 
The plan also included that Maria should not live with B.P. at Nina=s house. 





[3]In Lewelling,
the supreme court stated that the mother=s unemployment and crowded
living conditions amounted to no evidence of significant impairment to the
child.  796 S.W.2d at 167.  Justice Doggett, writing for the majority, referenced a
portion of Justice Gonzalez=s dissenting opinion, in which Justice Gonzalez argued that
the failure to remove a child from an unstable environment might not be
considered an act or omission under the majority=s standards if not caused by the
parent.  See id. at 167 n.4, 171.  Justice Gonzalez stated that under the
majority=s holding, if a parent chooses to
live with the child in a Arat infested crack house with drug
addicts or partner swapping friends, but the parent does not use drugs,@ the Court would apparently reverse
the placement of the child with a non-parent. 
Id. at 171 n.4.  In
response, as set forth above, Justice Doggett stated that placing a child in an
unstable environment could be evidence of conduct that supported an impairment
finding but that the evidence in Justice Gonzalez=s hypothetical is the very type of
evidence that was Apatently absent@ from the record in that case.  Id. at 167 n.4.

We do not suggest that
the facts here are in line with the extreme hypothetical outlined by Justice
Gonzalez, but Maria=s inconsistent actions regarding
her service plan and counseling sessions evidence an unstable environment that
is not conducive to a structured physical and emotional development.





[4]See Lewelling, 796 S.W.2d at 167. 





[5]Maria stated, AI
worked at the Waffle House for a little while because they told me I had to
get a job when they first took my son, but then after that I just kind
of didn=t
want to work and then before that, I worked at Owens Auto.@  (Emphasis added).





[6]The statute, then section 14.03(d),
stated: AThe court shall appoint as a
possessory conservator the parent who is not appointed as a sole or joint
managing conservator unless it finds that parental possession or access is
not in the best interest of the child and that parental possession or
access would endanger the physical or emotional welfare of the child.@ 
Hopkins, 853 S.W.2d at 136. 
(Emphasis added).





[7]Because the evidence supports
findings that restricted access and possession would not endanger B.P., we need
not address whether the appointment of Maria as possessory conservator is in
B.P.=s best interest.  See
Tex. Fam. Code Ann. ' 153.191.