**In the Interest of W.M. and A.S., Children.**

No. 2–04–172–CV.

Court of Appeals of Texas, Fort Worth.

Aug. 18, 2005.

---

David A. Pearson, IV, Fort Worth, for Appellant.

Tim Curry, Criminal Dist. Atty., Charles M. Mallin, David M. Curl, Anne Swenson, James Teel and Clifford Bronson, Asst. Criminal Dist. Attys., Fort Worth, for Appellee.

Panel F: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

LEE ANN DAUPHINOT, Justice.

After a bench trial, the trial court terminated the parental rights of W.M. and A.S.'s birthparents, denied the requested relief of the intervening foster parents and Appellants Wesley and Sandra S., the intervening maternal grandparents, and gave the Texas Department of Family and Protective Services ("TDFPS") permanent managing conservatorship ("PMC") of the children. In two points, the grandparents contend that the evidence is factually insufficient to show that awarding TDFPS PMC of the child W.M. is in the child's best interest and that the trial court abused its discretion in denying them grandparent access to the children. Because we hold that the trial court did not abuse its discretion, we affirm the trial court's judgment.

## BACKGROUND FACTS

W.M. was born on August 23, 2001, while his parents were living with the grandparents. About one month after his birth, the child was removed from his parents by TDFPS because his legs had been broken and his esophagus had been torn. W.M.'s mother, Crystal, admitted that she had caused the injuries and was later convicted. Wesley's testimony indicates some denial or minimizing of his daughter Crystal's responsibility for W.M.'s injuries:[1]

Q. Now, can you tell the Court what your understanding is of what kinds of injuries W.M. received? Like, was it broken bones? Was it bruising?

Tell the Court what it is your understanding is—

A. Well, my understanding was it was just stress fractures to his little legs.

Q. When you say "just stress fractures," what do you mean by that?

A. Well, to his little legs. That's all I know.

. . . .

Q. Now, ultimately, your daughter was convicted of causing the injuries to W.M.; is that correct?

A. Yes, sir.

---

1. We substitute W.M. for the male child's name and A.S. for the female child's name throughout the record excerpts.

Q.   Now, you have had many opportunities to talk to your daughter Crystal about what happened to cause the injuries to W.M., haven't you?

A.   Uh-huh.

Q.   And she's told you what her version of events is regarding the injury to W.M., hasn't she?

A.   Uh-huh.

Q.   What has she told you?

A.   Well, that she was tired and she might have hurt his legs when she went to change his diaper, or she doesn't really know what happened.

Q.   And has that been her story pretty much consistently since the date of the removal?

A.   Pretty much.

Q.   When you say "pretty much," have there been changes in her position?

A.   Well, she did say one time that he fell off the bed.  She had went to get medicine for him and left him at home with Lee. That was the weekend we were out of town.

Q.   What do you think caused the injuries?

A.   Well, I have no idea.

Q.   Have you ever told anyone you feel that—that it was Lee M ... who actually caused the injuries?

A.   Yes.

Q.   And why did you tell people that? Is that because that's what you feel?

A.   Well, because he had an anger problem.

.   .   .   .

Q.   .... So your understanding of the injuries that W.M. received that resulted in his removal in September of 2001 was that he had two breaks to his leg?  Is that your understanding?

A.   No. I was understanding they weren't broke, they were just fractures.

Q.   So your description is not breaks, but fractures?

A.   Yes.

Q.   So do you think the injuries to W.M. were serious?

A.   Well, at that time, I didn't know.

Q.   Well, now what is your position?

A.   No.

Q.   Not really?

A.   Not really.

Q.   Okay. Now, your daughter had been convicted for those injuries, correct?

A.   Yes, sir.

Q.   And she received a 12–year sentence; is that right?

A.   Yes, sir.

Q.   Now, she did not plead guilty to injuring the child; is that correct?

A.   Right.

Q.   She had a trial on that?

A.   Right.

Q.   Now, do you feel that—that your daughter intentionally hurt W.M.?

A.   Not intentionally, no.

Q.   Do you think that she accidentally hurt him?

A.   Yes.

Q.   Now, since—I'm not going to argue with your—what you believe?   All right?

So since you believe that her—that the injuries that she caused to W.M. were accidental, do you think that— that she can learn to properly parent, since the only injuries that she caused were accidental?

A.   Yes. Eventually, yes.

Q.   And do you think she has pretty much learned her lesson?

A.   Yeah, I think she has.

Q.   And so when she is released from prison, you think that at that point she

probably would be able to properly parent, since she has learned her lesson and since it was an accidental injury?

A. No, not at that time. I think she needs to take parenting classes and some more classes and learn a little bit more about children.

. . . .

Q. And so when she is released from prison, if she would take some parenting classes, which could take a couple months, you feel that she would probably be in a position where she could properly parent?

A. Probably.

. . . .

Q. Okay. And so she's eligible on a yearly basis to ask for parole; is that correct?

A. That's the way I understand it.

. . . .

Q. Could be eligible for parole in a year, right?

A. Yes.

Q. Okay. How do you believe that the fractures to W.M.'s legs occurred? What do you think your daughter actually did?

Do you think it was a diaper changing, or do you think she was frustrated and tugged on his legs?

. . . .

A. . . . . I don't know how she did it.

. . . .

Q. And you have asked her how she injured W.M., right?

A. No, really, I haven't talked to her about it. She got convicted of it, and I dropped it. I haven't said no more to her about it.

Q. If you were to be given custody of W.M., do you think that it would be important for you to develop, as best

you can, a relationship between W.M. and his mother?

Do you think that's important for W.M.?

A. No. Not right now, no.

Q. Well, when? When you say "not right now," do you feel that at some point it would be important for you to develop the parent/child relationship, as best you can, between Crystal and W.M.?

A. Well, I don't feel like that's going to happen until she gets completely off her sentence.

Q. But, at that point, when she is completely off of her sentence, you feel that it would be important to develop a relationship between the two or not?

A. Well, no, not really, because she will have been away from him too long. He is not going to know her as his mother.

. . . .

Q. If you were to be given custody of W.M., what would your opinion be on whether or not you should take W.M. to [the penitentiary] to visit with his mother?

A. That would be up to the Court. If the Court tells me no, then it ain't gonna happen.

Q. Well, what—I'm asking you [is] what you think would be appropriate.

A. I don't think so.

The grandparents did not find out until W.M.'s removal from his parents that his father, Lee, had a prior conviction for injuring one of his older children. They did, however, already know that he was on probation and had anger control problems.

TDFPS placed W.M. with the grandparents about two weeks after his removal, when he was six weeks old. Approximately five or six months later, the trial court awarded the grandparents PMC of W.M.

During that placement, TDFPS visits revealed that W.M. had his own room, plenty of toys, a playpen, a swing, and other appropriate accessories. The home was clean and appropriate for the baby. The visiting caseworker, Dawn Adkins, testified that Wesley was very nurturing with W.M. She also testified that W.M. had had reflux early in life and that Wesley sought appropriate medical care. Finally, she testified that the grandparents were appropriate in their feelings that Crystal had injured W.M.

A.S. was born in July 2002, severely premature. She had retinal hemorrhaging, an enlarged heart, and lung problems. In mid-October, she was released from the hospital, and TDFPS placed her in the grandparents' care. She required a heart and apnea monitor, and hospital staff trained the grandparents in its use before releasing A.S. into their care. In their training, the grandparents were told to seek immediate medical attention if the monitor sounded more than once. On October 28, 2002, the monitor sounded twice. Sandra called Wesley, who had just left the house. He returned, and they took the baby to the hospital, which was ten minutes away. Sandra testified that she did not call 911 because she knew from experience that she and her husband could get the baby to the hospital faster than the ambulance.

While A.S. was in the hospital, additional retinal hemorrhaging was discovered. Based on this single clue, TDFPS suspected shaken baby syndrome and would not allow A.S. to return to the grandparents' home. The doctors disagreed about the cause of the hemorrhaging, with one believing that it could have been caused by shaken baby syndrome and others believing it was caused by the premature birth. After leaving the hospital in early November 2002, A.S. was placed in a dual-licensed foster home, that is, a home in which the parents wanted both to foster and to adopt children. While with the foster parents, A.S. had two-hour monthly visits with her grandparents. At trial, one of the caseworkers, Lashika Christmas, admitted that TDFPS no longer had concerns of shaken baby syndrome by the time of trial. CPS supervisor Kim Caraway, however, testified that she could not state whether A.S. was shaken or not, but she did admit that there is a lack of evidence necessary to establish that the baby was shaken.

Regarding the placement of W.M. from November 2002, the foster mother testified, "Actually, when I got the call for A.S. about her being [a] shaken baby, I was told that she had a sibling and that he would be coming to our home as well." TDFPS removed W.M. from the grandparents' home in early November 2002, after he had been with them continuously for about fifteen months. TDFPS placed him in a non-relative placement for a couple of days and then placed him with Wesley's mother, Nadine, with whom he lived for about nine months. The grandparents were allowed to visit W.M. at Nadine's house as long as she agreed and supervised. Wesley visited almost daily; Sandra, who worked daily during the week, visited on weekends.

TDFPS caseworker Lashika Christmas testified that she did not observe W.M. while he was with the grandparents, but she did observe him with Nadine. He appeared to be fine, clean, appropriately dressed, and healthy. Her concerns with the placement were safety hazards in the backyard and Nadine's age. She also testified that she had protection concerns because Nadine stated that her family was loving, that her family would not harm children, that Crystal had not harmed W.M., and that no one had harmed A.S.

W.M. was removed from Nadine in August 2003 and placed in the same foster home as A.S.

After TDFPS removed W.M. from his great-grandmother's home, TDFPS decided to evaluate him. The evaluations showed that he was developmentally delayed by nine to ten months. Sandra testified that she knew that Nadine's home was not a stimulating environment for W.M.

The foster mother testified that when W.M. arrived at her home at almost two years of age, he did not appear to know how to use silverware and would not follow simple commands. She also claimed that he only knew five words when he came into her care. Significantly, one of the five words was *Paw–Paw*, the name he used for Wesley. Wesley testified that he did not believe that W.M. was developmentally delayed.

Although reluctant at first, the grandparents completed every task that TDFPS required of them to try to regain custody, including attending parenting classes and counseling sessions and completing psychological evaluations.

TDFPS's permanency plan for the children was to give TDFPS permanent managing conservatorship, terminate the parents' rights, and seek adoption for the children. Even though W.M. especially was bonded to his grandparents, particularly to his grandfather, TDFPS argued against grandparent access because it could militate against any potential adoptions.

At trial, the CASA advocate recommended that the children be reunited with their grandparents, and, alternatively, that W.M. be returned to live with them and that he and the grandparents have regular visitation with A.S. TDFPS introduced the parents' affidavits of relinquishment into evidence. No one challenged the termination of parental rights below, and no one challenges it here. The only issues are conservatorship and access.

PERMANENT MANAGING CONSERVATORSHIP

■ In their first point, the grandparents contend that the evidence is factually insufficient to support the trial court's finding that TDFPS should have PMC of W.M. They do not challenge the trial court's determination that TDFPS should have PMC of A.S.

■ Actions to determine the conservatorship of a child are governed by the best interest of the child.[2] The grandparents appear to contend that the burden of proof and standard of review regarding the best interest issue in custody matters are the same as those regarding the best interest issue in termination cases. They are not. The burden of proof in conservatorship cases, as opposed to termination cases, is a preponderance of the evidence.[3] The standard of review in conservatorship cases is abuse of discretion.[4] The trial court has wide latitude in determining the best interests of a minor child.[5] We will

**2.** *See* TEX. FAM.CODE ANN. § 153.002 (Vernon 2002).

**3.** *Id.* § 105.005; *In re A.D.H.,* 979 S.W.2d 445, 446 (Tex.App.-Beaumont 1998, no pet.); *In re Moss,* 887 S.W.2d 186, 187 (Tex.App.-Texarkana 1994, no writ); *MacDonald v. MacDonald,* 821 S.W.2d 458, 463 (Tex.App.-Houston [14th Dist.] 1992, no writ); *see also Choyce v. Dallas County Child Welfare Unit,* 642 S.W.2d 559, 560–61 (Tex.App.-Dallas 1982, no writ) (explaining that, because conservatorship is revocable and less drastic adjudication than termination, stricter clear and convincing burden is not applicable).

**4.** *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *see In re Jane Doe 2,* 19 S.W.3d 278, 281 (Tex.2000).

**5.** *Gillespie,* 644 S.W.2d at 451.

reverse the judgment of the trial court only when it appears from the record as a whole that the court has abused its discretion.[6] A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to guiding principles.[7] An abuse of discretion does not occur as to factual matters as long as some evidence of a substantive and probative character exists to support the trial court's decision.[8] Legal and factual sufficiency are not independent grounds for review in conservatorship cases, but they are relevant factors in deciding whether an abuse of discretion occurred.[9] In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion?[10] The traditional sufficiency review comes into play with regard to the first question.[11] With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision.[12]

■ The trial court did not file any separate findings of fact and conclusions of law supporting its ultimate conservatorship finding in the decree. When no findings of fact or conclusions of law are filed in a bench trial, the trial court's judgment implies all findings of fact necessary to support it,[13] but these implied findings are not conclusive. An appellant may challenge them by raising both legal and factual sufficiency of the evidence points.[14] Consequently, we will treat the grandparents' first point as a complaint that the trial court abused its discretion by finding that TDFPS should have PMC of W.M.

■ A court's primary consideration in any conservatorship case shall always be the best interest of the child.[15] Courts may use the nonexhaustive list of *Holley* factors to determine the child's best interest.[16] Those factors include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

**6.** *Id.*

**7.** *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

**8.** *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 211 (Tex.2002); *In re M.N.G.,* 147 S.W.3d 521, 530 (Tex.App.-Fort Worth 2004, pet. denied).

**9.** *In re D.R.L.M.,* 84 S.W.3d 281, 301 (Tex. App.-Fort Worth 2002, pets. denied); *see Beaumont Bank v. Buller,* 806 S.W.2d 223, 226 (Tex.1991); *Tex. Dep't of Health v. Buckner,* 950 S.W.2d 216, 218 (Tex.App.-Fort Worth 1997, no pet.).

**10.** *In re T.D.C.,* 91 S.W.3d 865, 872 (Tex.App.-Fort Worth 2002, pet. denied); *Norris v. Norris,* 56 S.W.3d 333, 338 (Tex.App.-El Paso

2001, no pet.). But note that at least one court rejects the two-pronged approach. *Zorilla v. Wahid,* 83 S.W.3d 247, 256 n. 1 (Tex. App.-Corpus Christi 2002, no pet.).

**11.** *T.D.C.,* 91 S.W.3d at 872; *Norris,* 56 S.W.3d at 338.

**12.** *T.D.C.,* 91 S.W.3d at 872; *Norris,* 56 S.W.3d at 338.

**13.** *Pharo v. Chambers County,* 922 S.W.2d 945, 948 (Tex.1996).

**14.** *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002).

**15.** Tex. Fam.Code Ann. § 153.002; *In re V.L.K.,* 24 S.W.3d 338, 342 (Tex.2000).

**16.** *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976); *T.D.C.,* 91 S.W.3d at 872.

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent [or potential conservator] which may indicate that the existing ... relationship is not a proper one; and

(9) any excuse for the acts or omissions of the [potential conservator].[17]

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.[18]

TDFPS argues that the evidence shows that the foster parents can provide a far more stimulating and nurturing environment for W.M., and a safer one. We do not agree with TDFPS that the evidence shows any such thing. As Anna Hunt, the CASA worker, and the only neutral observer who saw W.M. in the homes of the grandparents, Nadine, and the foster parents, testified, there are some positive aspects of the foster home and some different benefits of the grandparents' home. The evidence does show that the foster parents provided a much better home for W.M. than Nadine, but the grandparents did not place W.M. with her; TDFPS did. Further, the foster parents, like the grandparents, were also denied PMC. It is TDFPS who has conservatorship of these children under the order and who can place them in any adoptive home it sees fit.

Nevertheless, TDFPS does point out two key concerns: (1) our policy in Texas of trying to keep siblings together when it is in their best interest and (2) stability. Section 162.302 of the Texas Family Code provides, "It is the intent of the legislature that the department in providing adoption services, when it is in the children's best interest, keep siblings together and whenever possible place siblings in the same adoptive home."[19] In this case, termination was not challenged, and the trial court ordered that the State have PMC of both children and authorized the State "to place the children for adoption in a suitable home." The trial court's order of termination, which in practical terms allows the children to continue residing in the foster home of the foster parents, who hope to adopt the children, follows the intent of the statute, and we have no evidence that the children's placements have changed since the trial.

Additionally, placing both children in the custody of TDFPS follows our State's policy in custody disputes of placing children together when it is in their best interest. In *D.R.L.M.*, a couple who had adopted a little girl appealed the trial court's award of PMC of D.R.L.M., their little girl's half-sister, to that child's foster parents.[20] The little girls had never lived together. Our court explained the law on split custody:

> The Smiths [the adoptive parent's of D.R.L.M.'s half-sibling] argue that section 162.302(e) "codifies" prior Texas case law holding that siblings may not be separated absent a showing of clear and compelling reasons. They cite *In re De La Pena, Pizzitola v. Pizzitola, Dal-*

17. *Holley,* 544 S.W.2d at 371–72.

18. *In re C.H.,* 89 S.W.3d 17, 27 (Tex.2002).

19. Tex. Fam.Code Ann. § 162.302(e) (Vernon 2002).

20. *D.R.L.M,* 84 S.W.3d at 287.

*ton v. Doherty, Zuniga v. Zuniga, O. v. P.,* and *Griffith v. Griffith.*

We have carefully reviewed each of the cases cited by the Smiths. We cannot agree that these cases require us to read a clear-and-compelling-reasons burden of proof into section 162.302(e). First, none of these cases are adoption cases. They are custody cases. Second, the policy of "keeping" siblings together enunciated in these cases necessarily applies only to siblings already living together. Third, courts have traditionally applied the policy of keeping siblings together in custody decisions only to children of the same marriage, i.e., not to half-siblings.[21]

Unlike the children in *D.R.L.M.,* the children here, W.M. and A.S., were born to the same birth parents and at the time of trial had lived together for about nine months. Further, three separate entities—the foster parents, the grandparents, and the State—sought PMC of both children at trial. That is, unlike *D.R.L.M.,* the case before us involves the issue of both children's custody, not just that of one of them. Consequently, we hold that in this case, any party seeking to split the children up would have to show clear and compelling evidence to do so.[22]

The trial court had evidence before it that the grandparents believed that A.S. should not undergo a change in caretakers; that is, the grandparents testified that they believed it to be in A.S.'s best interest to remain with the foster parents because of her fragile health. The trial court was therefore faced with the decision of splitting up the siblings or leaving them both in their foster home, where they had resided together for almost nine months. That is, the trial court was faced with splitting

PMC of the children among the parties or leaving PMC of both children with one party. It chose the latter option. The two children had spent only a brief two weeks together before the State decided to place W.M. in foster care at the approximate age of twenty-four months, but some evidence at trial showed that bonding occurred while the children were in the foster home. The trial occurred more than a year ago. Presumably, the bond between the children has only deepened in the intervening period between the time of trial and now.

The grandparents introduced evidence that CASA worker Anna Hunt had recommended reuniting the children with them. At trial, after hearing the testimony, Ms. Hunt modified her recommendation to reunite W.M. with the grandparents but to leave A.S. with the foster parents and give W.M. and the grandparents access. She testified that W.M. was closely bonded to Wesley but that she had not seen evidence of a strong bond between W.M. and A.S. or between W.M. and the foster father at her home visits. TDFPS workers, however, as well as the foster parents, testified that W.M. and A.S. are closely bonded and that W.M. has bonded appropriately with their family and his sister. Based on our review of the evidence, we cannot say that the grandparents presented clear and compelling reasons to split the children up.

Additionally, as TDFPS points out, little W.M. had lived in five different homes with six different sets of parental figures at the time of trial, when he was a little more than two-and-a-half years old. The foster parents are his sixth set of parental figures. While TDFPS is under no legal obligation to maintain W.M. in his placement with them, the State's representatives at trial indicated that that is the plan,

---

**21.** *Id.* at 303 (citations omitted).

**22.** *See O. v. P.,* 560 S.W.2d 122, 127 (Tex.Civ. App.-Fort Worth 1977, no writ).

and that the foster parents wish to adopt. Given these two key concerns of keeping the siblings together when it is in their best interest and maintaining stability for W.M., we cannot say that the trial court abused its discretion by awarding PMC to TDFPS. We overrule the grandparents' first point.

### GRANDPARENT ACCESS

■ In their second point, the grandparents contend that the trial court abused its discretion in denying them grandparent access to the children. As TDFPS points out, the grandparents did not specifically plead for grandparent access. The initial statements of the attorneys reveal, however, that the issue of unsupervised access was tried by consent. Section 153.433 of the Texas Family Code provides,

The court shall order reasonable access to a grandchild by a grandparent if:

(1) at the time the relief is requested, at least one biological or adoptive parent of the child has not had that parent's parental rights terminated; and

(2) access is in the best interest of the child, and at least one of the following facts is present:

(A) the grandparent requesting access to the child is a parent of a parent of the child and that parent of the child has been incarcerated in jail or prison during the three-month period preceding the filing of the petition or has been found by a court to be incompetent or is dead;

(B) the parents of the child are divorced or have been living apart for the three-month period preceding the filing of the petition or a suit for the

dissolution of the parents' marriage is pending;

(C) the child has been abused or neglected by a parent of the child;

(D) the child has been adjudicated to be a child in need of supervision or a delinquent child under Title 3;

(E) the grandparent requesting access to the child is the parent of a person whose parent-child relationship with the child has been terminated by court order; or

(F) the child has resided with the grandparent requesting access to the child for at least six months within the 24–month period preceding the filing of the petition.[23]

The issue in this case is the best interest of the children. As our sister court in Dallas has held,

The trial court's judgment regarding what serves the best interest of the children with regard to visitation is a discretionary function and will only be reversed upon a determination that the trial judge has abused her discretion. This is because the trial judge "is in the best situation to observe the demeanor and personalities of the witnesses and can 'feel the forces, powers, and influences that cannot be discerned by merely reading the record.' "[24]

■ To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.[25] Merely because a trial court may decide a matter within its discretion in a different manner

---

**23.** Tex. Fam.Code Ann. § 153.433 (Vernon 2002).

**24.** *In re N.A.S.*, 100 S.W.3d 670, 673 (Tex. App.-Dallas 2003, no pet.) (citations omitted).

**25.** *Downer,* 701 S.W.2d at 241–42.

than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.[26] An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence.[27] Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision.[28]

Caseworker Lashika Christmas testified that continued grandparent access would not be in the children's best interest

[b]ecause just emotion concerns. If they were with the foster parents and just going back and forth, I mean, I just wonder what that would do to them emotionally. Because, I mean, you know, of course the foster parents have concerns now from when they do the visits and come back.

You know, there are problems that W.M. presents. But then you think about later down the line, if something happens to the [foster parents] and we have this order in place, and, of course, these children are eligible for adoption, what if they go into another adoptive home? Then what would that family do? Because they don't know anything about the grandparents. You don't know how they would feel about that continued access.

CPS supervisor Kim Caraway testified,

My concern would be that if it was ordered for the grandparents to have access, depending on what that access is, it could prevent the [foster parents] from wanting to adopt the children.

And, at that point, if that were to happen, we have a medically fragile baby and her sibling. It would be very difficult to find an adoptive home for them, just with that alone, along with, then, if you had some sort of orders for visitation with the grandparents, that would be another—could be another barrier to finding an adoptive home for the children.

The foster mother gave conflicting testimony regarding grandparent access. She testified that the grandparents and A.S. appeared to be bonded and that she had no reason to believe that W.M. was not bonded to his grandparents. She also testified that she thought it was important that children know their family and that she had never discouraged W.M.'s relationship with his grandparents. But she had concerns about the grandparents' abilities to meet A.S.'s medical needs as well as the risks associated with transporting A.S. for visits.

She also had concerns about W.M.'s behavior after visits with the grandparents. She testified that he had temper tantrums and was sick soon after each visit, but she admitted that the symptoms had lessened a lot over the months W.M. had been living with her family. She believed that he got sick because his grandparents fed him junk food on his visits, and she refused to consider the possibility that he might have separation anxiety after having to leave his grandparents each week. She also testified that based on a gut feeling, she was afraid that the grandparents might not bring W.M. home after a visit, even though they had never threatened to run with him and had never been threatening, intimidating, or abusive to her or her husband. Finally, she testified that she would be

---

**26.** *Id.*

**27.** *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex. 1978); *see also Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997).

**28.** *Butnaru,* 84 S.W.3d at 211.

concerned about the level of care that he would receive while he was with his grandparents.

The children's CASA advocate recommended that W.M. be returned to the grandparents because

> from my observations, the ties to—between W.M. and the grandparents are so strong that that's why I felt that reunification would be in his best interest.

> But from A.S.'s standpoint, she is so fragile that I would tend to agree that it probably would be detrimental to her health to be removed from the environment and the family that she has now. But I also believe it's in her best interest to know her grandparents and the love they have for her.

Finally, the children's guardian ad litem asked the Court to allow supervised visitation between the children and the grandparents to continue. We believe that this would have been an appropriate solution, but we see no evidence in the trial record that the grandparents alternatively sought or would have accepted supervised access to the children, especially W.M., nor can we conclude that the trial court abused its discretion by ruling differently than we would have.[29]

Based on the record, we cannot say that the trial court abused its discretion in denying grandparent access. But we can say that the law does not have all the answers, and we can say that a two-year-old's complete loss of the two most long-term, stable influences in his life cannot be a good thing, and we can implore the four adults who claim to love these children and want what is best for them to work toward a private compromise outside the legal system that will ensure the children's bright, stable future without erasing the positive remnants of their past. We overrule the grandparents' second point.

## CONCLUSION

Having overruled the grandparents' two points, we affirm the trial court's judgment.