

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00406-CV

| | | |
|---|---|---|
| In the Interest of R.H., J.B., and T.B. | § | From the 325th District Court |
| | § | of Tarrant County (325-458396-09) |
| | § | March 14, 2013 |
| | § | Opinion by Chief Justice Livingston |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Chief Justice Terrie Livingston



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00406-CV

---

IN THE INTEREST OF R.H., J.B.,
AND T.B.

----------

FROM THE 325TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Pro se appellant J.B. (Father) appeals the trial court's order that appointed him and A.M.H. (Mother) as joint managing conservators of their three children and that gave Mother the right to designate the children's primary residence. Father contends that the evidence is legally and factually insufficient to support the trial court's judgment. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

**Background Facts**

Mother and Father, who were married at the time of the trial, have three sons together: R.H. (Randy), born in August 2004; J.B. (Jacob), born in November 2006; and T.B. (Tim), born in August 2008.[2] According to Father, in 2009, he and Mother separated because she had an extramarital affair, and he became the primary caretaker of the boys, therefore providing for them "emotionally, physically, [and] financially." From May 2009 until March 2011, Father possessed the children and took them to various activities, including school, sports, and birthday parties. Father testified that during the time that he possessed the children, he encouraged Mother to visit them, but she usually did not do so. Mother testified that during that time, she bought clothes and toys for the children, and they visited her at her apartment.

In May 2009, Father filed an original petition seeking sole managing conservatorship of the children and asking the trial court to name Mother as a possessory conservator. Father also asked the trial court to require Mother to pay child support, and he sought a temporary restraining order against her to prohibit her from, among other actions, disturbing the "peace of the children." In October 2009, Father filed another petition, again seeking sole managing conservatorship of the children. Father's October 2009 petition referenced an

---

[2]To protect the anonymity of the children, we will refer to them through pseudonyms. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012); *In re M.M.M.*, 307 S.W.3d 846, 848 n.1 (Tex. App.—Fort Worth 2010, no pet.).

October 7, 2009 order entered by an associate judge.[3]  Father later sought

enforcement of the October 7 order, referring to it as a restraining order and

arguing that Mother had violated its terms.

In June 2010, the trial court designated Father as the temporary sole

managing conservator of the children.[4]  In March 2011, pursuant to Father's

guilty plea for an offense that had occurred in July 2008, a district court convicted

him of possessing a forged check with the intent to pass it, which is a state jail

felony.[5]  The district court sentenced Father to six months' confinement.  Before

serving his sentence, Father sold a car to provide financial support for the

children.

Father did not tell Mother about his confinement because he believed that

she did not have a stable place for the children to stay and that she was in a

relationship with someone "who . . . the children should not be around."  Thus,

initially upon Father's confinement, the children lived with his family.  According

to Mother, between March 2011 and May 2011, Father's family schemed to keep

the children away from her by, among other acts, sending text messages from

---

[3]This order is not in the appellate record.

[4]The trial court's June 2010 order is likewise not in the record, but it is referenced in a later document.

[5]See Tex. Penal Code Ann. § 32.21(a)(1)(C), (c)–(d) (West 2011).  Father was first arrested for the forgery offense in October 2010.

3

Father's cell phone while pretending to be him. Mother did not know about Father's confinement until a couple of months after he had been in jail.

In May 2011, a court-appointed amicus attorney filed a motion to modify the June 2010 temporary order, noting that after the trial court had issued the order, Father had been confined. The trial court, reversing its previous temporary order, appointed Mother as the temporary sole managing conservator, named Father as the temporary possessory conservator, and stated that Father could have "no possession and access of the children" until further order of the court. The court also set a trial date on the custody of the children for September 2011.

Mother kept the children from May 2011 until September 2011 with some assistance from Father's sister when Mother went to work. Father testified at trial that after his release from confinement in early September 2011, he spoke to the children as much as he could, but Mother restricted his ability to see them. Mother testified that after Father was released from confinement, she took the children to see him a "few times."

Before the trial occurred, Father asked the trial court to name him as a joint managing conservator of the children with the exclusive right to establish their primary residence. At the time of the trial, Tim and Jacob were in prekindergarten, and Randy was in the second grade. Following the trial, in which Father, Mother, and the amicus attorney appeared, the trial court entered an order naming Father and Mother as joint managing conservators, stating that

4

Mother could designate the children's primary residence, ordering that Father could have possession of the children at designated times and on other occasions as agreed upon by the parties, and requiring Father to pay $345 per month in child support.[6]  Father appealed.

**The Propriety of the Trial Court's Final Custody Order**

In a concise pro se brief, Father principally contends that the trial court erred by finding that the children's best interests required Mother's designation as their primary caregiver.  Specifically, Father appears to argue that the trial court's decision to allow Mother to designate the children's primary residence was not based on legally or factually sufficient evidence.

As we recently explained,

> We review the trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion.  *Newell v. Newell*, 349 S.W.3d 717, 720 (Tex. App.—Fort Worth 2011, no pet.).  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).  Legal and factual sufficiency are not independent grounds of error in this context, but they are relevant factors in deciding whether the trial court abused its discretion.  *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g).

---

[6]From our review of the record, it appears that the trial court's October 3, 2011 order is the first final order concerning the custody of the children.

5

*Halleman v. Halleman*, 379 S.W.3d 443, 447 (Tex. App.—Fort Worth 2012, no pet.); *see also Strong v. Strong*, 350 S.W.3d 759, 765 (Tex. App.—Dallas 2011, pet. denied) ("The trial court is vested with broad discretion to determine which conservator will have the exclusive right to establish the child's primary residence.").

A trial court does not abuse its discretion on factual matters "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.). In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we review whether the trial court had enough information upon which to exercise its discretion and whether the trial court erred in applying its discretion. *Id.* "The traditional sufficiency review comes into play with regard to the first question. With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision." *Id.*

An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *M.M.M.*, 307 S.W.3d at 849. We must be cognizant that the trial court is in a better position to decide custody cases because "it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied).

6

When a trial court appoints parents as joint managing conservators of a child, it must give one of them the exclusive right to determine the child's primary residence. Tex. Fam. Code Ann. § 153.134(b)(1) (West 2008). The best interest of the child is the "primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002 (West 2008); *see also Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (reciting factors that courts may consider in determining the best interest of a child); *Sano v. Greenlee*, No. 02-10-00264-CV, 2011 WL 2436737, at *7 (Tex. App.—Fort Worth June 16, 2011, no pet.) (mem. op.) (applying the *Holley* factors to a trial court's determination of which conservator had the exclusive right to designate a child's primary residence).

Based on the evidence that the trial court received, it issued a finding of fact that it is "in the best interest of the children that . . . Mother should have the right to establish [their] primary residence." In making that finding, the trial court stated that it had considered, among other factors, the parents' qualifications "without regard to their gender," the physical and emotional needs of the children, Mother's and Father's parenting abilities, the stability of their homes, their acts and omissions reflecting on the propriety of their relationships with the children, and their ability, "or lack thereof, to encourage a positive relationship between the child[ren] and the other parent."

Each parent has a criminal history. Mother has three felony convictions related to burglary and engaging in organized criminal activity. In the burglary

7

case, she pled guilty, but she testified at the trial of the custody case that she had not committed the crime and that she had pled guilty only because she was twenty-two years old and she had been advised that she should not try to contest the charge. At the time of the trial, Mother was serving a term of ten years' community supervision.

Father committed the offense of possessing while intending to pass a forged check in July 2008 (about a month before Tim was born), and he was convicted and sentenced to 180 days' confinement in state jail for that offense in March 2011. Father explained that his 2011 conviction was based on him taking a copy of a check, scanning it, printing it out on "[c]heck paper," and making a duplicate. He admitted that he had done this between five and ten times and that he had planned on using the forged checks "[t]o get some money." Father has also been convicted three times for driving with a suspended license (in 1994, 1997, and 2001) and once for unauthorized use of a motor vehicle (in 1992). Father received probation for the latter offense, but he later violated the probation's conditions and served approximately two years in prison.

The evidence also established acts of each parent, beyond their criminal histories, that a factfinder could have weighed against them in its custody determination. For example, from 2009 until the trial in September 2011, part of which time Mother did not possess the children, she changed residences five times. Mother could not live in an apartment at the time of the trial because she had been previously evicted, she had a criminal background, and she did not

8

have enough money to pay a deposit and rent. Thus, on the trial date, Mother had been living with the children in a homeless shelter for almost two months. Father testified that Mother had told him that Randy "wasn't eating like he used to" and had lost weight while Father was confined.

At the time of the trial, Mother was in a relationship with a man that she had met at the homeless shelter, and that man had babysat the children on a few occasions. According to Father, Randy told Mother that he did not like her dating the man in the shelter. Father testified that Mother "like[d] to go out to clubs, leaving the children with a babysitter while she [went] out."

Father admitted that he had used illegal drugs and had been arrested for possessing drug paraphernalia in the past but stated that he had last used drugs in 2008 and that if the trial court had given him a drug test on the day of the trial, he would have passed it. Mother testified, however, that Randy had described seeing Father "putting green stuff off into a metal thing, twisting it[,] . . . and then smoking it."

Mother also testified that Randy had stated that when Father had possessed the children, he had taken naps while two of the children were awake and had told Randy to "put something in the microwave" if he was hungry while Father was napping. Mother opined that Father was a good father with respect to finances but that the way he got his income—by forging checks—was "not the right way." The evidence reflects that based at least in part on information that the police received from Mother about Father doing "illegal things," Father's

9

computer and printer were seized in 2010 at the same time of his arrest for possession of a forged check with the intent to pass it. According to Mother, after Father was released from jail, he "didn't have any money"; Father testified that he also did not possess a car or a valid driver's license at the time of the trial.[7]

When Mother gave birth to Randy, she was only fifteen years old, and Father was thirty-three years old; Father recognized that he had committed a crime by having sex with Mother when she was underage. Father testified, however, that he had learned of Mother's age only after he had discovered that she was pregnant.

Mother believed that Father often acted with spite and had temper tantrums toward her rather than acting for the benefit of the children. For example, Mother testified that Father had sought fifteen or sixteen protective orders against her and that he had called Child Protective Services about her. Mother expressed that through the litigation in the trial court, Father was using the children "as a rag doll." Once Mother obtained possession of the children in 2011, she had trouble getting their food stamps because Father's family would not give them to her. According to Mother, on Christmas in 2010, she was entitled to possession of the children, but Father hid them from her and would not

---

[7]A man who had employed Father most recently in November 2010 at a rate of between $200 and $250 per week testified that Father could work for him again. Father's 2010 tax return shows that he netted approximately $14,000 in 2010.

tell her where they were.[8]  When Father lived in Mansfield with the children, he did not tell Mother his address because he did not want her to know it.  Father's sister, Regina, admitted that when Father went to jail in March 2011, she kept the children away from Mother by being dishonest with her.

The trial court also received evidence that it could have weighed in favor of each parent's request to obtain primary custody of the children.  For example, although Mother had been living with the children in a homeless shelter for a sustained period of time on the date of the trial, she had maintained a job for two years, making $7.50 per hour, by being on call for clients who needed home health assistance.  Mother did not own a car, but she had been using Father's car to go to work.  Mother described the homeless shelter that she was living in as

> a program that helps people get on their feet. . . .  It allows you 12 months to save up your money.  You don't have to spend a dime out of your pocket.  You eat there.  You sleep there. . . .  So everything that you have . . . coming from your income, you can put it off into savings.  And so, when you get ready to leave the program, you won't have to, you know, fall back or be homeless again.

At the shelter, Mother took classes about how to be a proper parent and how to manage money.  The children also took classes at the shelter in which they worked with computers or participated in arts and crafts.  The shelter paid for Randy to attend the Boys & Girls Club after school every day.  Mother said that she was eligible for housing from the Arlington Housing Authority, which would

---

[8]Father disputed that he would not let the children see Mother on holidays.

likely contact her within two to three months after the trial occurred to arrange for her to have a home that she and the children could live in.

Johnny Allen, a military police officer who knew Mother and the children through the shelter, testified that he had mentored the children and had seen positive developments in them since they arrived there. Allen stated that the shelter

> is there to help people. [There are] programs put in place . . . [and] there's a step-by-step process that the people that live there [go] through. . . . [E]verybody has a criminal background check done on them the minute that they get there. If you're not up to standards, you don't come in there.
>
> . . . .
>
> . . . [T]he environment is set up to where you will succeed.

Mother opined that it was in the children's best interests to live with her because she would not "drag them through" situations like Father had. She testified that she did not know how many of the children's sporting events she had attended before receiving possession of them, but she knew that Randy had played baseball, football, and basketball and that Jacob had played football. Randy's sports coach testified that Father had actively participated in Randy's sports activities.

Randy's first grade teacher, Latia Lewis, testified that Randy was a bright student and that he had no behavior problems. Lewis said that Father came to Randy's school "a few times throughout the school year," that Father was very

involved in Randy's education, and that she had never met Mother.  Lewis also stated, however, that Father eventually withdrew Randy from the school.[9]

Father's former boss testified that Father had prioritized his children over his job, that Father was nice to the children, and that Father had cooked for them.  Father's aunt, Pamela, testified that before March 2011, Father had cared "very well" for the children for more than eighteen months and that when Father went to jail, he said that he wanted Mother to be able to see the children on the weekends but that he did not want the children's school and day care routines to be interrupted.  Like Mother, Father had taken some parenting classes.

Father testified that he had spoken with the children and that if "they had a choice, they would all say that they want to live with [him]" at the home where they had lived before he went to jail.  Father testified that he loved his children and that he would do anything for them.  Mother recognized that the children loved Father, explaining that when he got out of jail, she took them to visit him and they "almost jumped out of the car while it was moving."  According to Mother, the children had expressed that they wanted to live "[w]ith Daddy and Mommy."

---

[9]Randy missed school in part of April and May 2011.  Mother said that the reason she did not return Randy to the school was because she did not "want any of [Father's] family members coming up there and . . . running off with him."  To avoid failing a grade, Randy attended the last week of school for the 2010/2011 school year.

Regina, who cared for the children from March to April 2011 while Father was confined, opined that the children's best interests would be served by Father and Mother sharing custody of them. When Father went to jail, Regina began to have a good relationship with Mother, and Mother and the children stayed with her for several weeks. Regina expressed that she did not ever see Mother being a bad parent to the children. Regina testified that she saw the children a couple of weeks before the trial began and that they looked like they were happy and were being taken care of.

Father explained that he could provide for the children financially and that his employment could provide flexibility to care for them. He testified that if he possessed the children, he would enroll them in a public school and in day care and use Medicaid to pay for their healthcare.

Considering all of these facts, we cannot conclude that the trial court abused its discretion by giving Mother the right to designate the children's primary residence; there is at least "some evidence of a substantive and probative character . . . to support the trial court's decision." *W.M.*, 172 S.W.3d at 725. Specifically, although a factfinder could have weighed some of the evidence summarized above in Father's favor, the trial court could have reasonably determined that it was in the children's best interest for Mother to be their primary caregiver because Father had a more prolonged and diverse criminal history than she did; he had an apparent pattern of attempting to reduce her involvement in the children's lives; he was not working at a stable job at the

time of the trial like she was and, according to her, did not have money; he had used illegal drugs in the past while there is no evidence that she had; and he did not possess a car or a driver's license to be used in transporting the children. Furthermore, the trial court could have reasonably preferred Mother because she had been taking classes at the shelter to become a better parent and because the children appeared to be doing well in her care at the time of the trial, as conceded by Regina.

For these reasons, although we recognize that the evidence at trial presented a close case, to the extent that Father argues that the trial court abused its discretion by allowing Mother to designate the children's primary residence, we overrule that argument. *See id.*

In his brief, relying on section 153.003 of the family code, Father also appears to assert that the part of the trial court's judgment that orders him to pay child support is discriminatory because the court did not order Mother to pay child support earlier in the litigation. *See* Tex. Fam. Code Ann. § 153.003(3) (West 2008) (stating that a trial court shall not consider the gender of the parent in determining the terms and conditions of conservatorship and possession of a child). While making this argument, Father refers to a "trial" that he claims occurred in December 2009, but the reporter's record does not contain a transcript of any such proceeding, and the clerk's record does not contain a December 2009 order. Thus, we cannot discern the rationale behind any decision of the trial court concerning temporary child support, and we cannot

15

determine the merits of Father's apparent contention that the trial court erred by failing to require Mother to pay child support in December 2009 while ordering him to pay it later.[10]  We overrule that argument.

Finally, in one sentence in the "SUMMARY OF ARGUMENT" part of his brief, Father argues that "all parties were not notified of trial, specifically the Office of the Attorney General."  The Attorney General intervened in the suit in September 2009, asking the trial court to make appropriate orders for conservatorship and support of the children, but according to the record filed in this court, the Attorney General did not otherwise appear in the trial court before or at the September 2011 trial.  After the trial concluded, the Attorney General nonsuited its intervention.  Father has not cited any legal authority indicating that the parties' apparent failure to give the Attorney General notice of the trial requires a reversal of the trial court's judgment, and we have found none.  Thus, we overrule Father's last argument as inadequately briefed.  *See* Tex. R. App. P. 38.1(i); *Allegiance Hillview, L.P. v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 873 (Tex. App.—Fort Worth 2011, no pet.).

---

[10]We note, however, that in the trial court's June 2011 order that named Mother as the children's temporary sole managing conservator and Father as their temporary possessory conservator, the trial court did not require Father to pay child support because the court found that it was "in the best interest of the children that no [temporary] child support be ordered."

**Conclusion**

Having overruled each of Father's arguments on appeal, we affirm the trial court's judgment.

TERRIE LIVINGSTON<br>
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED:  March 14, 2013