**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00286-CV**
_____

**IN THE INTEREST OF L.J.L.**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. F-213,651-E**

**MEMORANDUM OPINION**

This is an appeal of a SAPCR ("Suit Affecting Parent-Child Relationship").

After a bench trial, Mother appeals a modification order entered by the trial court

concerning her daughter, L.J.L.[1] The modification order granted Father the exclusive

right to designate L.J.L.'s primary residence. In two issues, Mother complains the

trial court abused its discretion by modifying custody because there was insufficient

evidence supporting the trial court's implied findings that a material change of

circumstances had occurred and that the modification was in L.J.L.'s best interest.

---

[1]To protect the privacy of the parties, we use the child's initials and refer to
certain other individuals by their relationship to the child. *See* Tex. Fam. Code Ann.
§ 109.002(d).

1

As discussed herein, we affirm the trial court's Order in Suit to Modify Parent-Child Relationship.

BACKGROUND

Mother filed a Petition to Modify Parent-Child Relationship seeking to modify the 2012 Order Establishing Parent-Child Relationship ("2012 Order"). Mother alleged that the circumstances of the child, a conservator, or other party affected by the 2012 Order had materially and substantially changed since the date of rendition and that modification was in L.J.L.'s best interest. Mother requested that Father's access and possession be restricted to supervised possession. Father filed an Original Answer denying Mother's allegations the same day the trial court signed an Order in Suit to Modify Parent-Child Relationship finding that Father failed to appear and wholly made default. Father filed a Motion for New Trial and to Set Aside Default Judgment, in which he argued that Mother failed to properly serve him and that he had a meritorious defense because L.J.L. had made an outcry claiming sexual abuse had occurred at Mother's home. Father alleged that L.J.L. had been interviewed at the Houston Children's Assessment Center, and based on the interview, Child Protective Services ("CPS") had created a safety plan and did not want L.J.L. returned to Mother's home until they completed the investigation. Father included his Affidavit, in which he averred that sending L.J.L. back to Mother's home would jeopardize L.J.L.'s mental, physical, and emotional health because

2

L.J.L. had reported that her sister ("Sister") was sexually abusing her. The trial court set aside the default judgment and granted Father a new trial.

Father filed a Counterpetition to Modify Parent-Child Relationship alleging that the circumstances of the child, a conservator, or other party affected by the 2012 Order had materially and substantially changed since the date of rendition and requesting that he be appointed as the person who has the right to designate the child's primary residence. Father alleged that Mother had a history or pattern of family violence and child neglect, CPS found that physical and sexual abuse may have occurred in Mother's home, and that a safety plan required him to keep L.J.L. Father requested that the trial court limit Mother's access and possession to supervised visitation or to unsupervised daytime visits outside Mother's home and pleaded that such modification was in L.J.L.'s best interest. Father attached his Affidavit, in which he averred that L.J.L. had alleged that Sister sexually abused her at Mother's home, and Mother had slapped and threatened to choke L.J.L. At Father's request, the trial court appointed a Guardian Ad Litem for L.J.L.

The trial court conducted a bench trial. Mother testified that she was L.J.L.'s primary conservator, who was nine years old, and that L.J.L. had thrived under her care. When the trial occurred, Mother lived in Houston, and she explained that L.J.L. would be attending fifth grade in Alief Independent School District. Mother testified that she has three children, and she currently resides in her home with L.J.L. and her

3

son, who is twelve. Mother told the trial court that L.J.L., while living with Mother, had made allegations of sexual abuse against Mother's fourteen-year-old daughter, Sister, who had been living with an aunt for over a year. Mother explained that under the court's orders, Sister could not be around L.J.L. unsupervised, and she had complied with that order. Mother testified that L.J.L. outcried to Father, and Mother suspected that Father had coerced L.J.L. to make the outcry.

Mother also told the trial court why she filed a suit to modify the trial court's 2012 Order. According to Mother, she wanted the order modified because she wanted the trial court to reduce Father's visitation with L.J.L. Father responded to the suit, by accusing Mother of abusing and neglecting L.J.L. and keeping her in an unsafe environment. Mother denied all of Father's allegations and explained that CPS never found she had abused L.J.L., nor had CPS removed L.J.L. from Mother's care. Mother explained that pending the results of the current investigation, CPS had issued a safety plan to Father, and Father was supposed to return L.J.L. to her. Father had, however, failed to do so and kept L.J.L. for six months. Mother testified that she kept sister and L.J.L. separated, cooperated with the investigation, allowed CPS to visit her home, and that CPS had ruled out the allegations against her. Mother also testified that neither she, nor Sister were charged with any criminal activity, and L.J.L. had not made any further outcries. Mother explained that if the court allowed

4

her to maintain custody of L.J.L., she would continue to abide by the court's requirements regarding arrangements for Sister and L.J.L.

Mother testified that while in her care, L.J.L. attended school virtually the past school year, because Mother was concerned about COVID, and she understood that was one of Father's concerns. Mother explained that she had enrolled L.J.L. in school for the upcoming school year and that there were no issues with L.J.L. moving to the fifth grade. Mother also explained that the previous summer both she and Father submitted to drug testing, and she tested positive for marijuana. Mother testified that while on vacation without L.J.L., Mother said she tried THC candy, which she legally purchased in California, and she claimed she did not regularly use marijuana. Mother further testified that she believed drug use was not a concern because the Department of Family and Protective Services ("the Department") had not requested drug testing in over a year.

Mother believed it was in L.J.L.'s best interest for her to remain the primary conservator with the exclusive right to designate L.J.L.'s primary residence and for Father to have supervised possession and access because of his negative influence. Mother was aware that L.J.L. had informed the Guardian Ad Litem that she preferred to live with Father, but she felt Father had influenced that decision. Mother denied telling L.J.L. not to discuss what occurred in Mother's home, and she explained that CPS found her home was appropriate. Mother testified it would be detrimental to

uproot L.J.L. from her Houston home, school, and friends. She also admitted that Father did not approve of her moving to Houston, but the 2012 Order did not include a geographical restriction. Mother explained that due to her work schedule, L.J.L. walked to and from school with her siblings and other neighborhood friends, and Mother added that a family member met L.J.L. when she got home. Mother also testified that L.J.L. saw a counselor concerning her outcry of sexual abuse, but Mother did not believe that Sister had sexually assaulted L.J.L. as L.J.L. had claimed. Mother further testified that L.J.L. claimed that something occurred at Father's home and told her she did not want to stay there. Mother explained that she was currently employed, had health insurance for her children, and had almost completed her psychology degree online.

Father testified that he had lived in Beaumont for over twenty years with his mother and stepfather. Father explained that L.J.L. has her own room and attends Beaumont Independent School District. Father testified that he always wanted joint custody of L.J.L. and to share 50% of the responsibilities and time, and he was concerned that Mother spent L.J.L.'s child support on her other children, who did not receive any child support. Father testified that after Mother moved to Houston, L.J.L. was dirty and smelly 50% of the time he picked her up, and he would "wipe her down right quick." Father testified that he complained to Mother but "tried to work things out" outside of court, and he explained he did not have money to hire

6

an attorney. Father explained that he called CPS twice in 2013 or 2014 to complain about L.J.L.'s condition when he picked her up, which also included her having bite marks and scratches. CPS, however, had ruled out his complaints.

Father testified that when L.J.L. was three or four, he had just returned from picking L.J.L. up from Mother when he found L.J.L. on top of his girlfriend's child "humping and kissing on him." Father testified that when L.J.L. told him where she learned it from, he believed that Sister might have been sexually inappropriate with L.J.L. When he called Mother to discuss what he had seen, she told him "it was denied on her end." Father did not report the incident to CPS because he was "trying to co-parent[]" and thought Mother would "eradicate whatever might have been transpiring." Father also testified he called CPS when L.J.L. was six, because she told him that Mother had slapped her and threatened to choke her until she passed out if she continued to ask to live with Father. Father also complained that Mother had denied him access to L.J.L., but he admitted that he never filed any enforcement actions against Mother.

Father testified that after L.J.L. outcried, he kept L.J.L. from Mother for approximately six months without court authorization, because he was trying to protect L.J.L., who begged him to keep her. Father also testified that after he tried to talk to Mother about L.J.L.'s allegations of physical and sexual abuse, L.J.L. told him that Mother whipped her and yelled. Father explained that he was seeking a

7

modification because L.J.L. made an outcry. Father testified that after L.J.L. made an outcry to her teacher at school, he took her to the Children's Assessment Center. Father explained that Mother did not believe that Sister assaulted L.J.L., that Mother was more concerned about getting L.J.L. back than solving the problem, and that Mother did not remove Sister from her home until the court ordered her to do so.

Father testified that he is currently employed, works four day shifts per week and has flexibility as a supervisor. Father also explained that L.J.L. has family and church support in Beaumont and is making "all A's" in school. Father testified that the CPS investigation was pending when Mother filed her motion to modify, and that he filed his modification because he was concerned for L.J.L.'s safety. Father explained that CPS had ruled out any allegations against him. Father believed that appointing him as the primary conservator with the exclusive right to determine L.J.L.'s primary residence was in L.J.L.'s best interest. Father did not request supervised visitation with Mother, but he did request that the court order include L.J.L. being separated from Sister when L.J.L. is with her Mother.

The trial court took judicial notice of all pleadings on file as well as the Guardian Ad Litem's report. The trial court also considered the findings of the CPS investigation, which, among other findings, ruled out allegations of neglectful supervision and physical abuse against Mother. That said, the CPS investigation found "reason to believe" as to the allegations of sexual abuse against L.J.L.'s sister.

8

After considering the evidence, the trial court signed an Order in Suit to Modify Parent-Child Relationship, found the material allegations in Father's Counterpetition to Modify true and correct, and ruled that the requested modification would be in L.J.L.'s best interest. The trial court appointed the parents as joint managing conservators, granted Father the exclusive right to designate L.J.L.'s primary residence, and ordered Mother to supervise L.J.L.'s contact with Sister. Mother appealed.

## ANALYSIS

In two issues, Mother complains the trial court abused its discretion by modifying custody because there is insufficient evidence to support the trial court's implied findings of a material change of circumstances and to support the finding that modifying the order is in L.J.L.'s best interest.

We review a trial court's modification order under an abuse of discretion standard. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding principles. *See In re A.E.M.*, No. 09-18-00288-CV, 2020 WL 826715, at *9 (Tex. App.—Beaumont Feb. 20, 2020, no pet.) (mem. op.). Under an abuse of discretion standard, the legal and factual sufficiency of the evidence are not independent grounds of error but merely factors in assessing whether the trial court abused its discretion. *In re A.E.D.*, No. 09-13-00555-CV,

9

2014 WL 4363445, at *3 (Tex. App.—Beaumont Sept. 4, 2014, pet. denied) (mem. op.). "This standard has been distilled into a two-prong inquiry: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion." *In re M.A.M.*, 346 S.W.3d 10, 14 (Tex. App.—Dallas 2011, pet. denied) (citations omitted); *see In re E.R.A.*, No. 09-20-00042-CV, 2021 WL 1031142, at *4 (Tex. App.—Beaumont 2021, no pet.) (mem. op.) (citation omitted). "'The traditional sufficiency review comes into play with regard to the first question. With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision.'" *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.) (quoting *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.)); *see In re E.R.A.*, 2021 WL 1031142, at *4.

Since trial courts have wide discretion to determine the child's best interest in resolving issues of custody and visitation, "'[t]he trial court does not abuse its discretion if its order is supported by some evidence of a substantial and probative character.'" *In re B.C.C.*, No. 09-21-00001-CV, 2022 WL 17350920, at *9 (Tex. App.—Beaumont Dec. 1, 2022, no pet.) (mem. op.) (quoting *In re A.E.D.*, 2014 WL 4363445, at *3). We review the entire record in determining whether the trial court's decision was arbitrary or unreasonable. *Id.* (citation omitted). The trial court does not abuse its discretion if it bases its decision on conflicting evidence, so long as

10

some evidence supports its decision. *Id.* (citing *In re H.M.W.*, No. 09-21-00047-CV, 2022 WL 710059, at *7 (Tex. App.—Beaumont Mar. 10, 2022, no pet.) (mem. op.)).

The factfinder "'is the sole arbiter of the witnesses' credibility and demeanor,'" and our review must defer to the trial court's factual determinations. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible. *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2022)). When, as in this case, the trial court does not issue separate findings of fact, we presume the trial court made all findings necessary to support its judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

A court that has continuing exclusive jurisdiction may modify an order that provides for the conservatorship, support, or possession of and access to a child. Tex. Fam. Code Ann. § 155.003(a). Section 156.101 of the Family Code sets out the grounds for modifying a conservatorship order:

> (a) The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:
>
> (1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:

11

(A) the date of the rendition of the order, or

(B) The date of the signing of a mediated or collaborative law settlement agreement on which the order is based[.]

*Id.* § 156.101(a)(1); *In re A.E.M.*, 2020 WL 826715, at *10. "'The change-in-circumstances requirement is a threshold issue for the trial court and is based on a policy of preventing constant re-litigation with respect to children.'" *In re A.E.M.*, 2020 WL 826715, at *10 (quoting *Smith v. Karanja*, 546 S.W.3d 734, 738 (Tex. App.—Houston [1st Dist.] 2018, no pet.)) (other citation omitted). Unlike termination of parental rights cases in which the statutory grounds for termination must be established by clear and convincing evidence, the standard of proof for a conservatorship decision is preponderance of the evidence. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

The child's best interest is the trial court's primary concern in determining issues of conservatorship, possession, and access. Tex. Fam. Code Ann. § 153.002. We assess the trial court's best-interest finding by using the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors include (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) any physical or emotional danger to the child now or in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to those individuals to promote the child's best interest; (6) the plans for the child by

these individuals; (7) the stability of the home; (8) acts or omissions by a parent tending to show that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Id.*

The trial court heard conflicting evidence regarding the *Holley* factors with respect to conservatorship, possession, and access. *See id.* After hearing all the evidence and observing the witnesses, the trial court found that it was in L.J.L.'s best interest that the parents remain as joint managing conservators and that Father have the exclusive right to designate L.J.L.'s residence. Based on the evidence concerning all relevant factors when the trial occurred, we conclude that some evidence of substantive and probative character supports the trial court's decision. *See In re B.C.C.*, 2022 WL 17350920, at *9. We further conclude that the trial court made a reasonable decision considering the evidence presented. *See In re E.R.A*, 2021 WL 1031142, at *4; *In re M.M.M.*, 307 S.W.3d at 849. Accordingly, we conclude that the trial court did not abuse its discretion by modifying its order. *See Gillespie,* 644 S.W.2d at 451. We overrule Mother's issues and affirm the trial court's Order in Suit to Modify Parent-Child Relationship.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on March 8, 2023
Opinion Delivered August 24, 2023
Before Golemon, C.J., Horton and Johnson, JJ.

13