

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00150-CV

IN THE INTEREST OF A.C.-D.R., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1] ON REHEARING

----------

After reviewing Mother's motion for rehearing, we deny it, but we withdraw

our opinion and judgment of October 10, 2013, and substitute the following.  After

a bench trial, the trial court denied the petition of the Texas Department of Family

and Protective Services (TDFPS) to terminate the parental relationship between

---

[1]*See* Tex. R. App. P. 47.4.

Ann[2] and her parents, A.B. (Mother) and A.R. (Father), but named TDFPS the child's permanent managing conservator (PMC) and Father's brother J.R. (Uncle) the possessory conservator. In five issues, Mother challenges the trial court's order appointing TDFPS as Ann's PMC. Because we hold that the trial court did not abuse its discretion by naming TDFPS Ann's PMC, we affirm the trial court's judgment.

## I. Statement of Facts

TDFPS called two witnesses, Father and the CPS worker, and offered no evidentiary exhibits.

Ann was born in mid-July 2011 and was eighteen months old at trial. According to Father, Mother had a drug problem in the year before Ann's birth. Mother's drug of choice was mainly marijuana, and she used marijuana during her pregnancy.

Mother had a long-term seizure disorder, but according to Father, she never took any medication for it during their relationship. Mother had at least one seizure during her relationship with Father. Father testified that he had urged Mother to take medication for her seizure disorder after Ann's birth but that Mother had resisted, telling him that Ann was her child and that she could do with Ann whatever she wanted.

---

[2]To protect A.C.-D.R.'s anonymity, we will adopt the parties' use of Ann as her alias. *See* Tex. R. App. P. 9.8(b)(2); Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2013).

2

When Ann was about three and one-half months old, Mother had a seizure and dropped the baby carrier with Ann in it. The baby carrier hit the ground, and Ann fell out, hitting her face on the curb and suffering injuries. Father testified that he rode with Ann to the hospital, but Mother did not go to the hospital until two days later. TDFPS removed Ann two days after Mother dropped her.

Mother admitted to the CPS worker that she was not on medication when she had a seizure and dropped Ann. Mother had still not filled her prescription for medication for her seizures when the CPS worker last spoke to her three weeks before trial.

Father reported that in November 2012, about a year after Ann's removal, Mother and her brother interrupted a family gathering at Father's home. Mother yelled at Father. Her brother, who appeared to be "on something," was violent and exhibited threatening behavior to Ann's grandfather and cousin. Eventually, the police were called. When Mother visited Father the next day to apologize, he

> looked her in the eyes and sa[id], ["]Do we really need any more violence in our life than we already have? We lost our daughter over it.["] And [Mother] kind of looked at [Father] and walked off at that point, and she realized that she was wrong for what happened [the previous day].

In addition to failing to take prescribed medicine for her seizures, Mother failed to complete many of the tasks on her service plan. She did not complete a psychological evaluation, parenting classes, a batterer's intervention program, or substance abuse counseling, which included anger management therapy, inpatient and outpatient treatment, and NA and AA classes. She also did not

3

demonstrate an ability to maintain income or employment or provide any proof of income.  Although Mother told the CPS worker that she could not work because of her seizure disorder, she was not receiving any SSI benefits.

The CPS worker also testified that Mother had not obtained and maintained safe and stable housing.  For about two and one-half months before trial, Mother had been living in an apartment with her boyfriend and his mother in Mesquite; CPS had not visited the apartment.  Mother had not indicated to the CPS worker that the home would be an appropriate place for Ann to live; Mother had instead indicated that she was going to be moving from that apartment.

Mother did regularly attend visits with Ann except for a two-month period after moving to Mesquite, and she told CPS that she lacked transportation and money to visit from her new home during that period.  CPS then scheduled longer visits for every other week at a McDonald's in Mesquite, and Mother attended them.

Mother had also tested negative on her most recent random drug test, and the CPS worker believed that Mother was drug-free.

Though aware of the hearing, Mother did not attend trial.  She told her attorney that it was because she could not afford to buy gas to drive from Mesquite to Fort Worth.  The trial court noted that the date and time of trial, January 15, 2013 at 9:30 a.m., had been set on September 27, 2012 and that the trial court had delayed the hearing about forty-five minutes for bad weather.

4

Mother's attorney conceded at trial that "[t]here's best interest all over the place to terminate [her] parent/child relationship."

When Ann was discharged from the hospital, she went to foster care. In July 2012, she was placed locally with Uncle and his wife (Aunt). Like Mother, Uncle did not attend trial.

Father testified that he and Uncle were very close and that Uncle had always been his protector. Father also testified that he talked to Uncle almost every week. But despite the fact that Ann had lived with Uncle and Aunt for more than six months by the time of trial, Father testified that he had never seen Uncle or Aunt with Ann.

Father understood that if the trial court terminated his rights, he would have "nothing whatsoever to do with [Ann] anymore." Father clarified that "it would be up to [Uncle and Aunt] if they want[ed Mother or him] to see [Ann] at all." But if the trial court did not terminate the parental rights but granted only PMC of Ann, Father understood that he would still have some input into "what goes on with her." Father testified that he did "[not] want to fail [his] daughter anymore" or "to see more harm come to her."

Father testified that he did not sign his voluntary affidavit of relinquishment to avoid paying child support and that child support did not factor into his decision. The CPS worker confirmed that neither parent had paid any child support despite the trial court's child support order. Father also testified that he

did not relinquish his rights because of any promise or guarantee that Uncle and Aunt would be able to adopt Ann.

The CPS worker last discussed TDFPS's plan of termination with Mother less than three weeks before trial. Mother "understood the plan[,] and she said she was just wanting to make sure that her son would get his last visit." Her son, who was eight years old at the time of trial and lived locally with his maternal grandmother, had "come to a few" of the visits between Mother and Ann. The caseworker admitted that the boy and Ann know each other and that they are siblings. When asked about TDFPS's position on separating siblings, the case worker testified,

> A.   Normally, I would see that they'd want them together, but in this case [Ann] was very young in age, so, I mean, he does have, you know, visitations—you know, growing up with her. And, hopefully, you know, they'll still be able to see each other growing up.

> Q.   And would you agree that termination of the parent/child relationship will make this eight-year-old no longer [Ann's] sibling?

> A.   I understand that, yes.

> Q.   And has CPS ever been involved with [Mother] prior to [Ann's] birth?

> A.   No.

> Q.   Does CPS have any concerns about [Mother] parenting this eight-year-old child?

> A.   Yes.

6

Q.     Have any referrals been made to the 1-800 line or investigations regarding [Mother] and this eight-year-old?

A.     She's not caring for the eight-year-old.  Her mother is taking care of the eight-year-old.

Q.     And do you know what city her mother lives in?

A.     I believe it's Keller/Fort Worth area.

Q.     But you would agree that no referrals have been made regarding this eight-year-old?

A.     Not that I'm aware of.

. . . .

Q.     Okay. And the maternal grandmother that has [Ann's] older brother living with her, has she contacted the Department regarding placement of [Ann] in her home?

A.     No.

Q.     And how many times has [Mother] asked you to conduct a home study on her mother for possible placement?

A.     She hasn't.

The CPS worker also testified about the disadvantages of permanent managing conservatorship rather than termination:

Q.     And do you also understand that if permanent managing conservatorship rather than termination is granted, that either parent could file a motion to modify the order down the road?

A.     Yes.

Q.     And do you believe that that would be in the best interest of [Ann]?

A.     No.

7

Q.  Do you believe that that situation would cause a lot of litigation in the future for this family?

A.  Yes.

After TDFPS rested its case, Ann's attorney ad litem called Aunt as a witness. Aunt testified that Ann had been living with Aunt and Uncle for about six months and had made substantial progress and that "[e]very part of [Aunt and Uncle's] family loves [Ann]." Aunt testified that she and her husband planned to adopt Ann and raise her as their own child in the event of termination. Aunt also testified that she and her husband were able to meet Ann's present and future needs. Aunt additionally testified that Ann was in no current danger and that she and Uncle would protect Ann from any future danger "[j]ust like [they] would with [their] own children."

Aunt testified that in addition to Ann, the couple's seventeen-year-old nephew and three-year-old daughter lived in the home, Uncle's eight-year-old son came every other weekend, and Aunt was seven months' pregnant. All the other children in the home have bonded with Ann.

Aunt testified that she believed that adoption would provide "a more permanent placement and future for [Ann] than . . . a permanent managing conservator title for [Aunt and Uncle would]." On cross-examination by Mother's counsel, the following dialogue occurred,

Q.  Why is it that you are wanting to adopt [Ann] as opposed to have permanent legal custody of her?

8

A.    Well, because we want [Ann] to feel as if she is a part of a family and not an adopted child that may or may not see her mother or father again.

So far this whole case has been a very big roller coaster and I would never want [Ann] to feel displaced. She deserves the world and she deserves a family that is going to be there for her no matter what and, you know, that her family's going to be there for her Christmas, birthdays, Valentine's Day, the simple small things. [Ann] deserves that.

TDFPS's trial counsel followed up,

Q.    What does [Ann] call you?

A.    Currently, right now, we have not had her call us anything besides—we do say uncle, but she doesn't call us anything. She does walk around the house saying mommy and daddy, but we haven't pushed the issue because we did not know what was going on until today.

And being her aunt and uncle, really, we did not want her—if she did go back to Mommy and Daddy, we did not want her to be confused.

Aunt acknowledged that if she and Uncle adopted Ann, she would receive no State benefits. She testified that those benefits would not be a factor should they adopt Ann: "We haven't had any of that besides Medicaid so far, so I think we're pretty financially set since we're still living in the same place and still got jobs."

In its "Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship," TDFPS alleged the following,

14.    Permanent Conservatorship and Support of the Child

14.1.  Conservatorship

9

> 14.1.1.     Pursuant to §§ 153.005 and 263.404, Texas Family Code, if the child cannot safely be reunified with either parent, but may be permanently placed with a relative or other suitable person, the Department requests that the Court appoint the person as permanent sole managing conservator of the child; if the child cannot safely be reunified with either parent or permanently placed with a relative or other suitable person, the Department requests that the Court appoint the Department as permanent sole managing conservator of the child.

The trial court explicitly found in the termination decree that "the appointment of either parent as Managing Conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development," appointed TDFPS as Ann's PMC, and found that appointment to be in her best interest. The trial court also ordered that Uncle would remain the child's possessory conservator and found that appointment to be in her best interest.

## II. Challenges to Appointment of TDFPS as PMC

### A. Procedural Challenges

In part of her first issue, Mother complains that the trial court did not make the mandatory finding that it would not be in Ann's best interest to appoint her relative or another person as PMC.

TDFPS expressly sought the appointment of PMC in its petition independently of termination by pleading for permanent managing

10

conservatorship under section 263.404 of the family code, which Mother concedes governs the appointment of TDFPS as PMC in cases in which termination does not occur.[3] Section 263.404 requires that the trial court find two elements before naming TDFPS a child's PMC without terminating the parents' rights:

> (a) The court may render a final order appointing the department as managing conservator of the child without terminating the rights of the parent of the child if the court finds that:
>
> > (1) appointment of a parent as managing conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development; and
> >
> > (2) it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator.[4]

The trial court explicitly found in the decree that "the appointment of either parent as Managing Conservator would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development."[5] Mother raises no challenge to that finding.

It is true that the decree contains no explicit finding concerning the trial court's decision to not appoint a relative as Ann's PMC. To the extent that

---

[3]*See* Tex. Fam. Code Ann. § 263.404 (West 2008).

[4]*Id.* § 263.404(a).

[5]*See id.* § 263.404(a)(1).

11

Mother argues that there is no finding that "it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator," we hold that the finding is implied.[6]

## B. Evidentiary Challenges

In the remainder of her first issue and her second and third issues, Mother contends that the evidence does not support the appointment of TDFPS as PMC and that the evidence is legally and factually insufficient to support the implicit finding that a relative placement is not in the child's best interest. As we have previously explained,

> The burden of proof in conservatorship cases, as opposed to termination cases, is a preponderance of the evidence. The standard of review in conservatorship cases is abuse of discretion. The trial court has wide latitude in determining the best interests of a minor child. We will reverse the judgment of the trial court only when

---

[6]*See Ruiz v. Ruiz*, No. 02-12-00136-CV, 2013 WL 530958, at *4 (Tex. App.—Fort Worth Feb. 14, 2013, no pet.) (mem. op.) (holding trial court did not abuse its discretion by denying appellant full extended possession after implicitly finding that it was not in child's best interest and citing *Celestine v. Dep't of Family & Protective Servs.*, 321 S.W.3d 222, 234 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that trial court made an implicit finding that waiver of section 162.009's six-month residency requirement was not in the children's best interest); and *In re C.R.T.*, 61 S.W.3d 62, 67 (Tex. App.—Amarillo 2001, pet. denied) (holding that evidence warranted trial court's implicit finding that presumption was rebutted such that conservatorship with parent would not be in children's best interest)); *see also In re C.B.*, No. 13–11–00472–CV, 2012 WL 3139866, at *5 (Tex. App.—Corpus Christi Aug. 2, 2012, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by implicitly finding that it was not in C.B.'s best interest to relocate to New Mexico with father; substantive and probative evidence demonstrated it was in C.B.'s best interest to remain in mother's custody because mother maintained a safe and healthy home that was free of sexual abuse).

it appears from the record as a whole that the court has abused its discretion. A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to guiding principles. An abuse of discretion does not occur as to factual matters as long as some evidence of a substantive and probative character exists to support the trial court's decision. Legal and factual sufficiency are not independent grounds for review in conservatorship cases, but they are relevant factors in deciding whether an abuse of discretion occurred. In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? The traditional sufficiency review comes into play with regard to the first question. With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision.

The trial court did not file any separate findings of fact and conclusions of law supporting its ultimate conservatorship finding in the decree. When no findings of fact or conclusions of law are filed in a bench trial, the trial court's judgment implies all findings of fact necessary to support it, but these implied findings are not conclusive. An appellant may challenge them by raising both legal and factual sufficiency of the evidence points.[7]

Consequently, we will treat the remainder of Mother's first issue and her second and third issues as complaints that the trial court abused its discretion by appointing TDFPS, and not a relative, as the child's PMC.

Subsection (b) of section 263.404 of the family code provides that in deciding whether to appoint TDFPS as the child's PMC, the trial court shall consider the following factors:

---

[7]*In re W.M.*, 172 S.W.3d 718, 724–25 (Tex. App.—Fort Worth 2005, no pet.) (citations omitted).

13

(1) that the child will reach 18 years of age in not less than three years;

(2) that the child is 12 years of age or older and has expressed a strong desire against termination or being adopted;

(3) that the child has special medical or behavioral needs that make adoption of the child unlikely; and

(4) the needs and desires of the child.[8]

Limiting ourselves to the evidence admitted at trial, we see that the only relevant factor is (4), the child's needs and desires.  But as we have explained before,

[a] court's primary consideration in any conservatorship case shall always be the best interest of the child.  Courts may use the nonexhaustive list of *Holley* factors to determine the child's best interest.  Those factors include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

---

[8]Tex. Fam. Code Ann. § 263.404(b).

(8) the acts or omissions of the parent (or potential conservator) which may indicate that the existing . . . relationship is not a proper one; and

(9) any excuse for the acts or omissions of the (potential conservator).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.[9]

While there was certainly favorable evidence in support of naming Uncle and Aunt Ann's PMCs, there was also evidence supporting the trial court's decision.

Uncle and Aunt had never seen Ann before she was placed in foster care. Father asked them to consider taking custody of her. Even though he testified that Uncle and Aunt were good caregivers for Ann and that Aunt is "really good with" her, he also admitted that he had never observed Ann in their care. Uncle did not appear or testify at trial.

Ann has a half-brother. While it is not clear from the admitted evidence whether Ann and her older half-brother ever lived in the same home, Ann had an ongoing relationship with him. At trial, he lived locally with their maternal grandmother, who had not been evaluated by CPS as a potential conservator of Ann. While Aunt and Uncle as PMCs would have no legal responsibility to maintain Ann's relationship with her half-brother absent further court involvement,

---

[9]*W.M.*, 172 S.W.3d at 725–26 (citations omitted).

15

TDFPS must provide for frequent visitation or other ongoing interaction between siblings, unless

> (1) the court has ordered otherwise; or
>
> (2) [T]DFPS has determined and documented in the child service plan that frequent visitation or other ongoing interaction would be contrary to the safety or well-being of any of the siblings and the court has not ordered that visitation or contact between the siblings occur.[10]

Thus, by naming TDFPS Ann's PMC, the trial court addressed the concern that Mother expressed for her children's relationship before trial.

Further, Aunt became pregnant around the time that Ann moved in with the couple, which means the trial court could foresee that within two to three months of trial, Aunt and Uncle would be providing emotional and financial support to three children under the age of four years, an eight-year-old, and a teenage nephew.

While the trial court did not hear evidence about the details of the couple's finances, it is clear that the couple is not independently wealthy, as evidenced by Aunt's testimony that she and Uncle are "pretty financially set since [they're] still living in the same place and still got jobs." The evidence also indicated that Mother and Father had never paid child support for Ann, and there was no evidence that either intended to pay child support in the future. With the trial

---

[10]40 Tex. Admin. Code § 749.1327 (2013) (Tex. Dep't of Fam. & Protective Servs., What Are DFPS's Responsibilities To Siblings Who Are Not Placed Together Following A Removal from the Home?).

16

court appointing TDFPS as Ann's PMC, Aunt and Uncle may continue to receive the Medicaid health insurance benefits for Ann that they were receiving at the time of trial.[11] Further, if they meet eligibility requirements, they may receive reimbursement of all child-care expenses for Ann until she reaches the age of thirteen years old; had they been named PMCs instead of TDFPS, they would receive reimbursement of only fifty percent of those expenses if they met eligibility requirements.[12]

Additionally, had Uncle and Aunt been named PMCs, the CPS worker believed that this family would face "a lot of litigation in the future." Mother's appeal and motion for rehearing evince this prediction. While the parents could file a petition to modify the PMC status of TDFPS, legal counsel employed by the State of Texas or a subdivision thereof would defend TDFPS in that scenario.[13] Aunt and Uncle would face no obligatory legal costs in such a battle. The entire financial responsibility of defending against Ann's removal from their family in a private suit, however, would have rested with Uncle and Aunt.

Finally, by naming TDFPS Ann's PMC and not otherwise limiting parental contact in the order, the trial court ensured that Mother and Ann may continue to

---

[11]*See id.* §§ 700.315–.316 (Foster Care Assistance and General Eligibility Requirements for Foster Care Assistance), .1001–.1017 (Relative and Other Designated Caregiver Program).

[12]*See* Tex. Fam. Code Ann. § 264.755(c)(4)–(5) (West Supp. 2013).

[13]*See id.* § 264.009 (West 2008).

"maintain regular contact with each other" absent further court order restricting such contact.[14]

We acknowledge that the trial court was faced with conflicting evidence and policies. Had the trial court appointed Uncle and Aunt as Ann's PMCs, we could not have concluded that the trial court abused its discretion. We also acknowledge that none of the competing parties was a clear winner in the trial court—the parents' rights were not terminated, but Ann was also not returned to their care. In conservatorship cases, however, it is not the parties' wishes but the child's best interest that trumps all other considerations.[15] Given that the appointment of TDFPS as Ann's PMC (1) legally maintains her relationship with and access to her half-brother, (2) allows the maternal grandmother to be evaluated by TDFPS as a potential conservator for Ann, (3) can relieve Aunt and Uncle from some of the financial burden of raising Ann, (4) can shield them from potential litigation costs; and (5) ensures that Ann continue to have regular contact with Mother absent further court order, and given that there is "some

---

[14]*See* Tex. Dep't of Family and Protective Servs., *Child Protective Services Handbook*, § 6414.4—Contact Between the Parent, the Child in Care, and the DFPS Caseworker, *available at* http://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_6400.asp#CPS_6414_4, (last visited Nov. 26, 2013), *id.* § 6415—Maintaining Contact Between the Family and the Child, *available at* http://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_6400.asp#CPS_6415, (last visited Nov. 26, 2013).

[15]*See* Tex. Fam. Code Ann. § 153.002 (West 2008).

evidence of a substantive and probative character" supporting the trial court's decision, we cannot conclude that the trial court abused its discretion by leaving Ann in the home of Uncle and Aunt but appointing TDFPS as her PMC. We overrule the remainder of Mother's first issue and her second and third issues.

## III. Challenges to Endangerment Findings

In her fourth and fifth issues, Mother contends that the evidence is factually insufficient to support the endangerment findings. The trial court denied termination, however, and those findings have no bearing on the trial court's conservatorship determination, which we have already upheld.[16] We overrule Mother's fourth and fifth issues.

## IV. Conclusion

Having overruled Mother's five issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, MCCOY, and MEIER, JJ.

DELIVERED: November 27, 2013

---

[16]*See In re J.P.*, No. 02-10-00448-CV, 2012 WL 579481, at *10 (Tex. App.—Feb. 23, 2012, no pet.) (mem. op. on reh'g); *In re C.T.E.*, 95 S.W.3d 462, 469 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see also* Tex. R. App. P. 47.1.