

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-19-00041-CV

---

C.B., Appellant

V.

A.B., Appellee

---

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. D2018067

---

Before Sudderth, C.J.; Gabriel and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant C.B. (Father) appeals portions of the trial court's final decree of divorce. In two issues, Father argues (1) that the evidence does not support the trial court's division of the marital estate and (2) that the trial court abused its discretion by ordering that appellee A.B. (Mother) has the exclusive right to designate the primary residence of the couple's child (Child) "within Hood County, Texas[,] and within 60 miles of Anchorage, Alaska." We will affirm.

## II. BACKGROUND

At the final divorce hearing, Mother testified that she and Father married in August 2013 and that the couple had one child together—Child. Mother also has an older daughter from a prior marriage (Sister), whose father lives in Anchorage. According to Mother, she was born and raised in Anchorage, and that is where her family lives. It is also where she met Father. Because Father is employed by the Army Corps of Engineers, and because the work he was performing in Anchorage had been completed, the couple moved to Texas after Father decided that he would rather take a position with the Army Corps of Engineers in Fort Worth, Texas, rather than Nebraska. But Mother said that it was always the couple's plan to move back to Anchorage after Father had accrued enough time with the Army Corps of Engineers.

By Mother's account, when the couple lived in Anchorage, Father had a busy schedule that often included his going on four-week-long work trips. Since the couple

had been in Texas, Father's work schedule evolved into his being on the road for one to two weeks at a time, with Father routinely only staying in the couple's residence on the weekends. Mother testified that she had been a stay-at-home mom since the family moved to Texas. While Mother was on the stand, her attorney introduced a W-2 demonstrating that Father had made $87,621 gross income in 2017. Mother also said that Father received $1,600 monthly for disability pay and that Child had medical insurance available to her through Tricare.

Mother averred that she had begun working two weeks prior to the September 24, 2018 hearing. According to Mother, she works six and one-half hours a day and earns $10 per hour. Mother said that if she remained in Texas, her monthly expenses would be $4,771.70, but if she moved back to Anchorage her monthly expenses would reduce to $3,201.67. By Mother's account, her expenses would be less in Anchorage because she would be living with her grandparents, who raised her, and they would help her with childcare and expenses. She also said that if she returned to Anchorage, her earning capacity would increase, and she believed she could return to her old job there making $13 per hour.

Mother said that the reason she filed for divorce was because she learned that Father was having an affair. She also said that Father is now living with the person he was having the affair with (Girlfriend), who lives two and one-half hours away from where Mother and Child live. By Mother's account, this distance has affected Father's ability to have a relationship with Child, but Father does routinely Skype with Child.

3

Mother said that Father's work and other commitments often interfered with his ability to pick Child up for visitation and that Girlfriend had picked up Child multiple times because Father was either working or hunting. Mother said that communicating with Father had been "stressful" and that "something always comes up" when the two discuss visitation with Child. Mother testified that during the pendency of the divorce, Father had paid the bills sporadically—including the rent where she and Child were living—and that because of this, she had to borrow money from her grandparents to pay bills. She also said that during the marriage, she and Father had borrowed large amounts of money from her grandparents.

Mother averred that she was asking the court to allow her and Child to move to Anchorage. Mother proposed that Father have standard possession of and visitation with Child, including her staying with him during summers and major holidays. She also said that Father could visit Child in Alaska "any time he wanted to come up." Mother testified that it was feasible for Father to visit Child in Anchorage because he had multiple friends there, and he owns a rental home forty-five minutes away from Anchorage that was housing long-time friends of his. Mother stipulated that the Alaska home was Father's separate property. According to Mother, there are direct flights from DFW airport to Anchorage that last six hours and cost roughly $500. She also asked the court that, when he comes to visit Child, Father's visits occur within sixty miles of Anchorage—a distance that would allow for visitations to occur at the

4

home Father owns in Alaska. She stated that her schedule in Anchorage would be flexible enough to accommodate Father's visits with Child.

Mother averred that at Father's request, she submitted to a drug test and that the results were negative. As she testified, the trial court admitted into evidence the results of her drug test. Mother stated that even though she had taken her drug test, Father had not taken one because when he went for the test, his nails were not long enough for a sample. Mother said, however, that this was unusual because, even though his fingernails varied, he typically had long toenails and that he did not normally get manicures or pedicures.

Mother stated that returning to Anchorage would have a positive impact on her and Child's life because Mother had missed her family, and the ability to live with her grandparents would provide a better home for Child. She also said that all of her cousins live in Anchorage and that there are multiple relatives that are around Child's age. Mother recalled a recent visit to Anchorage and how she was able to take Child camping and fishing "and kind of gave her the life that [Mother] had growing up." Mother said that although she had relatives living in Texas, she did not know many of them, had not seen many of them in years, and did not know where they lived. Mother acknowledged that she had a babysitter she trusted for Child that lived a few houses away and that she had started recently dating someone she has known for many years that lives nearby. Nevertheless, she averred that neither she nor Father had any real support system in Texas. She also said that because of his job, Father

5

was rarely around their Texas residence. Mother stated that the parenting arrangment that she proposed was in Child's best interest.

Mother's grandfather (Grandfather) testified at the hearing. Grandfather said that he had raised Mother most of her life and that he and his wife had visited Mother, Father, Child, and Sister once or twice a year since they had moved to Texas. Grandfather said that it was a viable option for Mother and her daughters to move to the grandparent's home in Anchorage because they have a large home that contains up to seven bedrooms (some of which currently serve as offices that can easily be converted to bedrooms). Grandfather said that there is a large support system in Anchorage for Mother and her daughters, including himself, his wife, Mother's mother, and two of Mother's uncles.

Grandfather said that he had loaned Father and Mother money in the past, including an $18,000 loan for the purpose of paying off debts from Father's prior divorce. He also said that during the pendency of the divorce, he had financially assisted Mother, mainly for legal bills. Grandfather said that he has never had any concerns about Mother's parenting abilities and that he believed it was in Child's best interest that she be allowed to move to Anchorage with Mother. Grandfather also said that he could think of no good reason for Child to remain living in Texas given the minor support network she has in Texas versus the robust support network Child would have in Anchorage.

Father also testified at the hearing. Father averred that he had made between $87,000 and $89,000 gross income in 2017 and receives $1,600 monthly as a disability payment. Father said that he was currently paying $1,420 a month in child support to Mother. Father stated that as a driller for the Army Corps of Engineers, he works "regions" and that currently he was assigned to a region that covered "Fort Worth to Waco to Fort Hood."

Father said that he objected to Child moving to Anchorage because he believed that he would not have the ability "to be her father or spend any time with her." Father said that his research into flights from DFW to Anchorage revealed that flights can last between eight and twenty-three hours and can cost between $600 and $1,200. He also stated that if he were to drive to Anchorage from his home, it would take him two days if he drove eighteen hours each day.

According to Father, at the time of the hearing, his current visitation schedule was to visit Child on the first, third, and fifth weekend of every month on Saturdays from 10:00 a.m. until 7:00 p.m. and on Sundays from 9:00 a.m. until 6:00 p.m. According to Father, visitations with Child were difficult because he lived 112 miles away from her, and he routinely was scheduled to work every other weekend. But Father averred that he and his boss were trying to work out a schedule so that he could be off for more visitation weekends.

By Father's account, he and Mother had communication problems regarding visitations and that after Mother and her daughters had spent the entire month of July

7

in Alaska, she did not communicate with him for three weeks after she returned. He also said that Mother did not effectively communicate with him regarding Child's medical needs.

Father denied having an affair while together with Mother and said that he only started dating Girlfriend after he and Mother had separated, but he agreed that he had known Girlfriend prior to the separation—he met her through one of his friends when he went with a group to a bar one night. According to Father, he was unaware that the drug test he was to take would be done via nail clippings, and he had gone and attempted to take the test, but the lab determined that his nails were too short to retrieve a sample. By Father's account, he returned a week later and the lab took nail clippings, but he had not heard back regarding any results of a test. Father said that he routinely trims his fingernails because he works with his hands and that he routinely trims his toenails because he wears steel-toed boots to work.

Father said that most of Mother's family in Alaska have "an extensive criminal record" and that the grandparents lived in Florida during winters. Father stated that he was concerned that if Child moved to Anchorage she would not see him often enough and that eventually she would not remember him well and not have "the father figure in her life that she needs." He also said that he does not accrue enough vacation time to be able to visit Anchorage regularly and that frequent travel would be cost prohibitive. Father said that he was asking the court to set a geographical restriction that Child remain in Texas and that he would be willing to travel anywhere

in Texas to visit Child. He also averred that he had "years of work lined up" in his current region and that it was unlikely that he would be relocating any time soon.

On cross-examination, Mother's attorney introduced a photograph of Father and Girlfriend getting pedicures. Father agreed that he had captioned the photograph, ostensibly on social media, with the statement, "[I]t's what you do when your plans with your daughter get denied." Father said that he did not know exactly when the photograph was taken but that it must have "been just a couple of weeks" before the hearing when he allegedly was told that he could not visit with Child that weekend. According to Father, Mother had denied him visitation because she believed he "was under the influence that weekend." But Father agreed that he got his manicure either a week before or a week after he was unable to provide a nail sample to the lab for drug testing.

Mother's attorney also introduced a series of text messages between Father and his friend that transpired before divorce papers were served on him. Initially, Father said that he did not know who had sent the texts, at one point even claiming that his phone had been "tapped" and that Mother had "hacked" his Facebook account. But eventually, Father reluctantly agreed that he had texted his friend a picture of Girlfriend, allegedly before she was his girlfriend, and a picture of a pro se divorce petition. Specifically, Father texted his friend that he would be "dropping divorce papers soon." Father also texted his friend that he had not been happy being married to Mother "for a long time" but that he was "not looking forward to the child

9

support." Father further texted that he was going to offer Mother $800 a month in child support as well as his house in Alaska. On the stand, Father admitted that he was surprised by Mother's filing for divorce.

Other texts between Father and his friend stated that Father was happy when he was with Girlfriend. The texts also revealed, and Father admitted, that Girlfriend had visited him in New Mexico for a week prior to him being served, but he swore that the two were just friends at that time. In other texts, Father asked his friend not to say anything to anyone about Girlfriend until "the dust settled." Another text from Father stated that he would be bringing Girlfriend to "the ranch" soon. The friend replied that he did not think that was a good idea while Father and Mother were still married.

Further texts between Father and his friend showed extensive conversations about marijuana—including a discussion about the friend's dad growing marijuana—and about cocaine use. In one particular text, Father stated that he was quitting marijuana "until after this is over" and that if "she trie[d] to pull anything, [Father could] use [Mother's own drug use] against her." In the same series of texts, Father relayed how Girlfriend "knows everything," apparently regarding his drug use and the marijuana growing. Another text from Father stated that Mother did not "know about" Girlfriend, but "[Mother] has suspicions."

The texting goes on to reveal a conversation between Father and his friend wherein the friend tells Father to be careful and that if Mother could prove Father

10

had been committing adultery, it would look bad in court and affect the division of the marital estate. Father responded to that text by stating, "She can't prove anything."

Other texts stated that Father was willing to let Mother move to Alaska with Child and that he would pursue custody of Child in the future. In another text, Father asked his friend, "How can I get custody if I am gone all the time[?]"

Father testified that initially he was okay with the idea of Child moving to Anchorage with Mother and that was why he texted those messages. Father also admitted that he had offered Mother at least three settlements wherein Mother would have been allowed to take Child with her to Anchorage, but that Mother had deemed the offered settlements as "not good enough." Father said that he changed his mind about Child moving to Anchorage after he had experienced visitation issues regarding Child.

Father stated that he and Mother had both habitually used marijuana in the past and that Mother had used marijuana while pregnant with Child, but Father admitted that he "didn't say anything" to Mother about her use while pregnant. Father claimed that he had stopped using marijuana right after he and Mother separated because he "realized that [he] was using it as a crutch for [his] emotional discontent." According to Father, Mother's mother and one of her uncles smoke marijuana. Father claimed that he had even smoked marijuana with both of them.

In the final divorce decree, the court ordered, among other things, that Father and Mother were to be joint managing conservators of Child with Mother having primary custody and "the exclusive right to designate [Child's] primary residence within Hood County, Texas[,] and within 60 miles of Anchorage, Alaska." The trial court further ordered that "as long as [Child] is under three (3) years of age and Respondent, [Father], does not reside in Alaska, [Mother] shall reimburse [Father] for twenty-five percent (25%) of his travel (coach flight costs only) to Alaska for his periods of possession as set out herein." Child was one year old at the time the trial court entered its final decree. This appeal followed.

## III. DISCUSSION

### A. Division of the Marital Estate

Even though Father briefs two issues on appeal, his first issue arguing that the evidence does not support the trial court's division of the couple's estate is now moot. Father complains specifically in his first issue that the trial court erred by ordering him to maintain a Survivor's Benefit Plan with Mother as the sole beneficiary as well as ordering him to execute a "Form RI 76-10" to permanently assign Father's Federal Group Life Insurance benefits to Mother. But as Mother points out in her brief, after Father submitted his brief to this court in July, the trial court entered an agreed "Final Decree of Divorce Nunc Pro Tunc" on September 11, 2019. In the nunc pro tunc decree, the specific orders that Father complains of regarding his Survivor's Benefit Plan and his Federal Group Life Insurance have been removed, and Father is no

12

longer obligated to provide such benefits to Mother. Thus, we overrule Father's first issue.

## B.    The Domicile Restriction

In his second issue, Father argues that the trial court abused its discretion by ordering that Mother had the exclusive right to determine the primary residency of Child. Specifically, Father argues that despite the trial court's ordering "nominal reimbursement" to assist him in visiting Child in Anchorage, the trial court abused its discretion by finding that a geographical restriction allowing Mother to relocate Child to Anchorage was in Child's best interest. We disagree.

We review the trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *In re M.P.B.*, 257 S.W.3d 804, 811 (Tex. App.—Dallas 2008, no pet.); *see In re W.M.*, 172 S.W.3d 718, 724 (Tex. App.—Fort Worth 2005, no pet.) (reasoning that the trial court has "wide latitude in determining the best interests of a minor child"). To determine whether a trial court abused its discretion, we must decide whether the court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004); *W.M.*, 172 S.W.3d at 725. An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently

in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see Low*, 221 S.W.3d at 620.

An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence. *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding). Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002); *W.M.*, 172 S.W.3d at 725. We must be cognizant that the trial court is in a better position to decide custody cases because "it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied).

In our review of a child-custody ruling under the abuse-of-discretion standard, legal and factual sufficiency are not independent grounds of error but are relevant factors in deciding whether the trial court abused its discretion. *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g); *see W.M.*, 172 S.W.3d at 725. In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *W.M.*, 172 S.W.3d at 725; *T.D.C.*, 91 S.W.3d at 872. "The traditional sufficiency review comes into play with regard to the first question. With regard to

14

the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision." *W.M.*, 172 S.W.3d at 725 (footnote omitted).

Texas does not have any specific statute regarding residency restrictions in custody cases.[1] *See Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002); *In re M.M.M.*, 307 S.W.3d 846, 850 (Tex. App.—Fort Worth 2010, no pet.). In *Lenz*, the Texas Supreme Court provided a variety of factors relevant to the determination of whether a geographic restriction is in the best interest of the child, including: (1) the reasons for and against the move, including the parents' good faith motives in requesting or opposing it; (2) health, education, and leisure opportunities afforded by the move; (3) the degree of economic, emotional, and educational enhancement for the custodial parent and child; (4) the effect on extended family relationships; (5) accommodation of the child's special needs or talents; (6) the effect on visitation and communication with the noncustodial parent to maintain a full and continuous relationship with the child; (7) the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the noncustodial parent and child; and (8) the ability

---

[1] In his brief, Father cites to Texas Family Code Section 153.001 and asserts that Section 153.001 "provides factors for the court to use in evaluating whether lifting the geographic restriction violates Texas public policy." Tex. Fam. Code Ann. § 153.001. It is true that the *Lenz* court stated that the public policy announced in Section 153.001 outlined the "framework upon which we may build guidelines for . . . residency restriction for purposes of relocation," but the *Lenz* factors were designed to "give meaning to the[] public policy imperatives" found in Section 153.001. *Lenz*, 79 S.W.3d at 14. Because Section 153.001 does not itself set out factors in the relocation context, the *Lenz* court developed the *Lenz* factors. *Id.*

of the noncustodial parent to relocate.[2]  79 S.W.3d at 15–16.  In doing so, the supreme court recognized that cases such as these are intensely fact-driven and therefore involve the balancing of these numerous factors, as opposed to formulaic tests.[3]  *Id.*

In this case, the majority of the *Lenz* factors support the trial court's ordered geographical restriction.

---

[2]Although *Lenz* involved a modification proceeding, the factors are also applicable in an appeal of a trial court's decision regarding geographic restriction in a divorce decree.  *See Yasin v. Yasin*, No. 03–10–00774–CV, 2011 WL 5009895, *3 & n. 3 (Tex. App.—Austin Oct. 21, 2011, no pet.) (mem. op.) (explaining that while *Lenz* involved a motion to modify, "the factors are also applicable in an appeal of a trial court's decision regarding geographic restriction in a divorce decree").

[3]Although both parties cite to and analyze the *Holley* factors that reviewing courts typically utilize to address the inquiry of whether termination of a parent's rights to a child is in the best interest of a child, we decline to use these factors because they address a completely different inquiry than the one posed in relocation or residency-restriction cases.  *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (articulating factors to be analyzed by reviewing courts in determining the best interest of a child in termination of parental rights cases).  Indeed, *Lenz* was written twenty-six years after *Holley*, and the *Lenz* court did not address the *Holley* factors when discussing how a number of jurisdictions dealt with the question of relocation or geographic restrictions.  79 S.W.3d at 15–16.  While it is true that some courts have mixed the *Lenz* and *Holley* factors together when addressing a relocation or geographic-restriction case, this court has not.  *Compare Womack v. Womack*, No. 10-05-00182-CV, 2006 WL 1911004, *5 (Tex. App.—Waco July 12, 2006, no pet.) (mem. op.) (utilizing both the *Lenz* and *Holley* factors in a relocation case) *with M.M.M.*, 307 S.W.3d at 849 (utilizing only the *Lenz* factors, this court held that trial court did not abuse its discretion by declining to include geographic restriction on child's domicile); *see also In re M.V.*, 583 S.W.3d 354, 357 (Tex. App.—El Paso 2019, no pet.) (analyzing only the *Lenz* factors and holding that trial court did not abuse its discretion by lifting geographic-residency restriction).

1.	*The Reasons for and Against the Move, Including the Parents' Good Faith Motives in Requesting or Opposing it*

Here, Mother's stated reasons for wanting to move to Anchorage were so that Mother's grandparents could provide a stable home and economic support for her and Child and that Child would be able to grow up around family members with whom Mother had a relationship. Mother also said that she had a greater earning capacity in Anchorage than in Texas. Conversely, Mother and Grandfather both testified that Mother and Child had an almost nonexistent support system in Texas. There is nothing in the record that would have led the trial court to question Mother's good faith in requesting the move.

Father's stated reason for opposing the move was that he would not be able to visit Child enough to establish a proper parent-child relationship and that he had difficulty with Mother in arranging visitation with Child. But the record indicates, especially through the text messages he sent to his friend, that Father appeared more concerned with the financial ramifications of potential child support than he was concerned with where Child lived. Indeed, in his text messages, Father told his friend that he was going to ask that Mother take the home in Alaska and receive only $800 a month in child support and then he would allow Child to move to Anchorage with Mother. Father also admitted at trial that he had attempted to agree to three different settlements which included Mother's right to move Child with her to Anchorage, but that he had been told the offers were "not good enough." The trial court was free to

17

conclude that Father's motives for not wanting Child to move to Anchorage were not in good faith and to find that this factor weighed in favor of the ordered geographical restriction.

### 2. Health, Education, and Leisure Opportunities Afforded by the Move

Mother testified that she and Child had recently visited Anchorage and that she had taken Child camping and fishing and that she desired that Child would have these same leisure opportunities afforded to her in the future. Child has health coverage through Tricare whether she lives in Anchorage or in Texas. And the record is devoid of any indication of either Mother's or Father's intentions as far as Child's education. The trial court was free to find that this factor weighed in favor of the ordered geographical restriction.

### 3. The Degree of Economic, Emotional, and Educational Enhancement for the Custodial Parent and Child

As mentioned, some of Mother's stated reasons for wanting to move to Anchorage were so that she could benefit from being able to earn more money and be provided support from her family in the form of having somewhere for her and her daughters to live. Mother also testified that she missed her family and that she wanted Child to have a similar upbringing to hers. Mother further said that she has relatives in Anchorage that were similar in age to Child. Grandfather testified that the grandparents would allow Mother and her daughters to live with them in their seven-bedroom home. He also said that Mother would not initially have to pay rent.

18

Although there is no evidence in the record regarding how Child's education might be enhanced (she was one year old at the time of trial), the trial court was free to find that this factor weighed in favor of the ordered geographical restriction given the testimony of Mother and Grandfather regarding how Child's situation could be emotionally and economically enhanced.

### 4.     *The Effect on Extended Family Relationships*

Both Mother and Grandfather testified that Child would be around an extended family if she moved to Anchorage, a family to whom Mother is close. Conversely, Mother and Grandfather both testified that Mother and Child lack a support system in Texas. And Mother testified that although she knew of relatives who lived in Texas, she did not have a relationship with any of them, and she did not know where many of them lived. Father offered no evidence that he had any extended family in Texas who would be impacted by Child moving to Anchorage. The trial court was free to find that this factor weighed in favor of the ordered geographical restriction.

### 5.     *Accommodation of the Child's Special Needs or Talents*

There is no evidence in the record that Child has special needs or talents given that she was one year old at the time of the final divorce hearing. This factor neither weighs for nor against the trial court's ordered geographical restriction.

6.      *The Effect on Visitation and Communication with the Noncustodial Parent to Maintain a Full and Continuous Relationship with the Child*

Mother testified that she would be willing to accommodate Father's visiting Child in Anchorage any time he wanted. She also stated that Father would be allowed to possess Child during summers and holidays. Furthermore, Father would still have the ability to Skype with Child, a method of communication with Child that Mother averred Father primarily utilized. Even though Father said that Child's moving to Anchorage would affect his ability to visit Child, the trial court had before it evidence that Father had difficulties coordinating visitations with Child when she lived in Texas. Indeed, after separating from Mother, Father moved 112 miles away from where Child lived, and he testified that this distance made it difficult for him to visit Child. The trial court also had before it evidence that Father missed multiple visitations with Child in Texas because he was either working or hunting.

There was also evidence that because of Father's work schedule, he is often away for weeks at a time. And the trial court had before it a text from Father to his friend stating, "How can I get custody if I am gone all the time[?]" The trial court was free to conclude that the barriers that prevented Father from having a continuous relationship with Child in Texas were similar to the barriers he would face if Child lived in Anchorage. Furthermore, the trial court relieved some of Father's financial concerns of traveling to Anchorage by ordering that Mother pay for one-fourth of his

travel costs to see Child until Child reaches the age of three. The trial court was free to find that this factor weighed in favor of the ordered geographical restriction.

7.     *The Possibility of a Visitation Schedule Allowing the Continuation of a Meaningful Relationship Between the Noncustodial Parent and Child*

As described under the last factor, Mother said that she was willing to accommodate Father's visitation in Anchorage any time he wanted. She also said that Father could possess Child during summers and holidays. And the trial court had before it evidence that Father's ability to visit Child in Anchorage would not be significantly different than his ability to visit Child in Texas. The trial court was free to find that this factor weighed in favor of the ordered geographical restriction.

8.     *The Ability of the Noncustodial Parent to Relocate*

Father testified that he had years of work lined up in Texas and that he did not anticipate being relocated anytime in the near future. But the trial court had evidence before it that Father owns a house forty-five miles away from where Child will live in Anchorage as well as evidence that Father had intended to move back to Anchorage after accruing more time with the Army Corps of Engineers. The trial court was free to find that this factor weighed in favor of the ordered geographical restriction.

Having concluded that the trial court had sufficient information before it upon which to exercise its discretion to find that the majority of the *Lenz* factors support the trial court's ordered geographical restriction, we conclude that the trial court did

21

not abuse its discretion by ordering the restriction. *See W.M.*, 172 S.W.3d at 725. We overrule Father's second issue.

## IV. CONCLUSION

Having overruled both of Father's issues on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: January 16, 2020